29482. WOODRUFF *v.* AMERICAN MUTUAL LIABILITY INSURANCE COMPANY *et al.*

DECIDED JULY 8, 1942.

T. Elton Drake, Herman Talmadge, Edward B. Lovell, for plaintiff.

Neely, Marshall & Greene, for defendant.

BROYLES, C. J.   Mrs. Belle Woodruff filed a claim for compensation for the death of her husband, Albert J. Woodruff, against Frick Company, the employer, and American Mutual Liability Insurance Company, the insurance carrier.   Upon the hearing of the case before a single director of the Industrial Board, an award in favor of the claimant was handed down. · On an appeal by the defendants the full board affirmed the award.   On the hearing of an appeal to the superior court, the judge entered an order reversing and setting aside the award; and that judgment is assigned as error in the bill of exceptions.   The ultimate question for determination is whether the award was authorized by the evidence adduced on the hearing before the director.   On that hearing the evidence disclosed the following undisputed facts:

About noon on December 17, 1940, while Woodruff was engaged in his duties as manager of the local office of Frick Company, he was accidentally struck on the left leg just above the ankle by a board on which were two metal cleats, causing a laceration several inches long, a bruise around the area, and a hematoma or blood clot about the size of a hen's egg near the cut.   He went to the office of his regular physician, Dr. Wood, who dressed his wound. He was then driven by his wife to his home where he remained until the following morning.   On that morning (December 18) he went back to his regular work and, except for two or three days' confinement in bed thereafter, he worked at his office daily until December 30, 1940, when he was stricken with a severe heart attack while seated in his office.   He was taken to a hospital, where he died that night or early the next morning.   Dr. Wood was out of town when he was stricken and when he died.   An autopsy was performed on the body to determine the cause of his death. Within three days after the death, Dr. Wood, after having read the autopsy report, certified to the Department of Public Health of the State of Georgia that the "primary cause of death" was "rupture of aorta into pericardial sac tamponade," and that contributing causes were "dilated aorta, small aneurism of aorta."   In answer to the question in the certificate, as prepared by the Department of Public Health, as to whether the death was caused by "accident, suicide, or homicide," Dr. Wood wrote: "? ? ? ?" and, after these question marks, added: "Had accident, injured 1 leg 12-17-40, piece of sawmill machinery struck him—not certain whether it contrib-

uted at all however." A certified copy of the death certificate was introduced in evidence.

The undisputed evidence further showed that Dr. Wood had been treating Woodruff for heart trouble, arteriosclerosis, and other serious diseases, from June, 1933, until his death in 1940; that in July, 1940, his blood pressure was "110/100," and it substantially so remained until his death, varying from time to time, up or down, ten points. His circulatory system was very definitely impaired and the vessels of his heart were weakened and thin. He went to Dr. Wood for treatment sometimes once a week, sometimes once a month or two months, and sometimes at longer intervals. He was "very short, stout, and fat;" and high blood pressure is more common, but not necessarily confined, to that type of person. On December 29, 1940 (the day before Woodruff's death), Dr. Wood dressed his leg, and found that the hematoma or swelling was getting smaller, there was no infection, no local heat or redness, and the injury was having a normal recovery, and Dr. Wood had no reason to think that his death was imminent. Woodruff was a very energetic, hard-working man, arriving at his office early in the morning, working all day, and sometimes on Sundays, against the warning of his doctor. In 1933 he and other members of the Georgia Public Commission, after an exciting and strenuous hearing, were dismissed from their offices by the Governor; and subsequently in that year Woodruff suffered a very severe heart attack. Some years later he twice engaged in heated State-wide political campaigns attempting to be re-elected. The autopsy on his body was asked for by Dr. Agnor (an associate of Dr. Wood), with the consent of the claimant, and Dr. Agnor, who was present at the autopsy, selected Dr. Hoffman, a pathologist, to make the autopsy. Neither the employer nor the insurance carrier had a representative at the autopsy. Dr. Hoffman was hired and paid by the claimant for his services. The autopsy report was not put in the evidence, and neither Dr. Agnor nor Dr. Hoffman was used as a witness for the claimant.

The above-stated facts are undisputed, but we have not attempted to set forth all of the facts but only those material to a proper consideration of the issues involved. Dr. Wood, a witness for the claimant, when asked if the accident of December 17, 1940, was a contributing cause to the death, replied: "I frankly say I don't

know whether the injury was a factor in Woodruff's death. It could have been." However, subsequently, on cross-examination, he testified that he had correctly stated the cause of death in the death certificate, and that when he said that the injury *could* have been a factor in the death, he was dealing with a *mere possibility;* that while it was *possible* the injury was a contributing cause to the death it was also possible that it had nothing to do with it. Dr. Wood further testified that the autopsy confirmed his diagnosis that the death resulted from Woodruff's heart troubles and the other diseases from which he was suffering. He also testified that Woodruff's death, even if he had not sustained the leg injury, would not have been unexpected; that he died within approximately the period of time that a person suffering from such serious diseases as he had would be expected to die. As to his statement that it was possible that the injury was a factor in Woodruff's death, and that it was also possible it had no connection therewith, it is well settled that "If the facts are consistent with either of two opposing theories, they prove neither." *American Mutual Liability Insurance Co.* v. *Harden,* 64 *Ga. App.* 593, 595 (13 S. E. 2d, 685), and cit. Therefore, that portion of Dr. Wood's testimony was not helpful to the claimant's cause. Properly construing Dr. Wood's testimony as a whole, and in connection with the death certificate signed by him, it clearly appears that in his opinion the leg injury had nothing to do with Woodruff's death.

Dr. Hoffman, who performed the autopsy, after explaining the condition of the body and its organs as disclosed by the autopsy, testified positively that the leg injury was not a contributing factor to the death; and he stated that in so testifying he was not depending upon theories and opinions but upon the conditions of the body and its organs as shown by the autopsy, and that if the leg injury had contributed to the death, *the autopsy would have disclosed it.* It is true that on cross-examination he admitted that an accident, depending upon its nature and seriousness, in some instances would accelerate the death of a person suffering from heart trouble, but after answering other questions that dealt with generalities he testified again that the autopsy clearly disclosed that the leg injury had no connection whatever with Woodruff's death, and he denied that the injury might have aggravated his pre-existing diseases. No other person who was present at the autopsy tes-

tified, and therefore the testimony of Dr. Hoffman as to the conditions of the body and its organs as disclosed by the autopsy was uncontradicted.

Dr. Richardson, a heart specialist, also testified positively that, after hearing the testimony of Dr. Hoffman as to the conditions of the body and its organs as shown by the autopsy, it would be a physical impossibility for the leg injury to have contributed to Woodruff's death. In this connection claimant's counsel was trying to prove it was possible that an embolus had escaped from the injured leg and produced an occlusion, but both Dr. Hoffman and Dr. Richardson testified that if an embolus had caused the death it would have produced the rupture of a vessel leading *into* the heart, while the autopsy disclosed that the rupture was in a vessel leading *from* the heart. Dr. McClung, basing his opinion upon the testimony of Dr. Wood as to the nature of Woodruff's leg injury and upon the facts disclosed by the autopsy, testified that in his opinion there was no causal connection between the injury and the death.

The claimant and her son testified that after the accident Woodruff suffered severely from his heart trouble, often clutched his chest, made grimaces of pain, and said he was bleeding inside; that while he returned to work the day after the accident, he was in bed sometime later for about three days, and did not work as hard or as regularly as he had done before the accident; that his heart distress appeared to be much greater after his injury than it was before. Dr. Christopher, testifying for the claimant, stated that he had not known Woodruff, and was not present at the autopsy, but had studied the autopsy report. His evidence consisted of his answers to certain hypothetical questions propounded to him. The questions and answers were based upon his interpretation of the autopsy report, although the report was not put in the evidence. The witness testified, in effect, that if Woodruff's heart began leaking immediately after his leg injury and continued to leak until the pericardial sac was filled with blood, it was reasonable to assume that the injury had produced the bleeding; whereas the undisputed medical testimony was to the effect that if the heart had begun to leak right after the accident and had continued to leak until the death of Woodruff, then *old* blood would have been found in the pericardial sac, and Dr. Hoffman testified that the autopsy

disclosed that no old blood was in the sac, and that all of the blood in the sac had leaked into it within forty-eight hours of the death. This testimony of Dr. Hoffman was uncontradicted.

Dr. Christopher also testified that an injury *could* aggravate a pre-existing condition by increasing the blood pressure, the pulse rate, and the blood count, whereas Dr. Wood, the attending physician, testified that Woodruff's injury did not increase his blood pressure or his pulse rate or his blood count. This evidence of Dr. Wood was uncontradicted. It therefore appears that Dr. Christopher's testimony, given in response to hypothetical questions, related to things which *could* have happened to Woodruff but which *did not* happen to him. If Dr. Wood had not treated Woodruff for nearly seven years immediately preceding his death, and if no autopsy had been made, Dr. Christopher's expert evidence might have been of some assistance in determining the cause of death, but when Dr. Wood's death certificate showed that the death was due to heart trouble, and when he refused to express an opinion in regard to any causal connection between the injury and the death, and when the autopsy disclosed positively that a ruptured aorta was the cause of death, the theories and speculations of Dr. Christopher are without probative value. Furthermore, he frankly admitted that he was not a heart specialist, and that Drs. Wood and Hoffman knew more about Woodruff's actual physical condition than he did. As to the testimony of the claimant and her son about Woodruff clutching his chest frequently after his accident and saying that his heart was bleeding, Dr. Wood testified that in his opinion a person could not know whether or not his heart was bleeding, and Dr. Hoffman testified that the autopsy showed that the only bleeding of the heart occurred after the fatal heart attack on December 30th.

In our opinion there is no evidence of probative value in this case showing that Woodruff's death was caused by his injury, or that the injury was a contributing factor thereto. As said by this court in *Ætna Casualty Co.* v. *Chandler,* 61 *Ga. App.* 311, 315 (6 S. E. 2d, 142) : "While susceptibility to injury will not prevent a recovery for disability or death proximately caused by an injury arising out of the employment, no compensation is payable where a pre-existing condition causes the death or disability independent of any subsequent mishap. If, during the course of the employ-

ment, death comes in an ordinary way natural to the progress of the disease with which one is afflicted and with which one has been smitten before the accident, there can be no recovery. . . There is nothing except an inference on an inference on which to base the finding that the alleged injury aggravated the disease. . . However much we dislike to interfere with the finding of the full board, and however limited our authority when such finding is supported by any evidence, we feel in this case that there was no evidence upon which to base a finding that the disease in this case of which the decedent died was aggravated by the work he was performing at the time of its onset." In the instant case, when the insurance carrier and the employer introduced in evidence a certified copy of the death certificate, a prima facie presumption was established that the cause of the death was the cause stated in the certificate. Code § 88-1212. Therefore, the burden was upon the claimant to overcome the prima facie case by the introduction of competent evidence of probative value showing that the cause of death was not the cause stated in the certificate. This burden was not carried by the claimant, and the award in her favor was contrary to law and the evidence. It follows that the judge of the superior court did not err in setting aside the award. The cases cited in behalf of plaintiff are distinguished by their facts from this case.

*Judgment affirmed. MacIntyre and Gardner, JJ., concur.*