38550. HALLIGAN v. UNDERWRITERS AT LLOYD'S, LONDON.

Decided December 5, 1960—Rehearing denied December 20, 1960.

*A. Mims Wilkinson, Jr., Albert T. Ehlers,* for plaintiff in error.

*Sam F. Lowe, Jr., Smith, Field, Ringel, Martin & Carr,* contra.

Townsend, Presiding Judge. The deceased was a man 69 years of age weighing about 200 pounds and with an aggravated heart condition of long standing who had been hospitalized while receiving treatment for heart and respiratory ailments,

to which treatment he was responding normally. On the night in question he was alone in the hospital room on a bed 34 to 36 inches high protected on each side by guard rails rising 14 to 18 inches above the mattress. He was checked every hour and found to be sleeping normally until about 4:30 a.m., a half hour after the last observation, at which time a nurse found him lying face down on the floor, dead, near the foot of the bed, with his feet toward and his head away from the bathroom and entrance doorways, arms folded under him. The sock on his left foot was torn; the toenail of the big toe of the left foot was split and torn from the toe, the toe of the sock was drenched in blood and the nurse who found him estimated there was a half of a measuring cup of blood on the floor. There were no other marks on the body, no indications of violence on the bed, and nothing in the bed which suggested the manner in which the toe could be so injured that the nail was torn from the flesh.

A medical witness testified in part: "Assuming that at that time the big toe on his left foot was bleeding around the nail and blood was on his stocking and also on the floor, in my opinion injury of some type would cause that bleeding. . . Assuming that he was in that position and those facts had occurred, and also knowing his physical condition with arteriosclerosis, congestive heart failure and his previous history of heart trouble, assuming that Mr. Halligan fell, that he fell heavily to the floor of his room and injured his toe to the extent that it bled, as to what effect that would have on his body and on his physical constitution, I think it might well have killed him. . . We know this, that any movement which would involve a great bodily stress, such as trying to catch oneself on his arms as he fell forward, indeed even the excitement and the sudden shock of falling, might well be injurious to the individual. . . I must say that, if a man weighing close to two hundred pounds fell on the floor, while it could have no effects, it might certainly lead to fatal results. . . Assuming that he died of acute heart failure, in my opinion the fall to the floor certainly could have caused acute heart failure. In my opinion as a physician, under those circumstances, *as to whether or not*

*it would have been the most likely cause, I think that's what killed Mr. Halligan."* (Emphasis added.) He also testified: "I testified this morning that Mr. Halligan had recovered from one of these coronary attacks, which left him with this infarction, several years prior to his death. Patients recover from such attacks far more frequently than they die from them. . . Mr. Halligan had a coronary thrombosis. . . It's my firm belief that if you took one hundred people with a coronary occlusion and threw them heavily on the floor . . . there would be a fifty percent increase in mortality, Now, if an individual had an acute coronary thrombosis, and acute occlusion of the coronary arteries, and if it were of sufficient intensity to kill him, and if it did kill him, that would immediately stop the blood from circulating. . . As to whether a wound on such a person's toe would bleed after such an attack which caused the heart to stop beating immediately, he might have oozing of a drop or two of blood, but he would not bleed in the ordinary sense of the word."

From all of the evidence introduced, a finding is demanded that at some time between four and four thirty or five a.m. the patient got out of bed without the guard rails being let down. There was testimony that it is much more likely for a person who suffers the onset of a heart attack to immediately sit or lie down than for him to stand up or walk about; therefore it is a logical inference that the heart attack developed after, rather than before, the patient commenced to get out of bed. There is undisputed evidence that he fell to the floor (though whether he fell from the bed or only from a standing position is not shown) and there is undisputed evidence that he was wounded by catching his toe in something with sufficient force to tear the sock and split and rip the toenail so severely that he lost a half of a measuring cup of blood. Nothing *in* the bed suggested itself as causing the injury. There is undisputed evidence that the deceased, after getting out of the bed, remained alive long enough to bleed a half cup of blood from a small wound in the big toe. There is medical opinion evidence that the patient's fall was the cause of his death, considering his weight, age, and physical condition.

"Only when the plaintiff's evidence does fail to prove the case as laid in the petition, without revealing as defense matter fatal to the cause pleaded, or where the evidence adduced by the defendant, as a matter of law, conclusively refutes the proof made of the plaintiff's case, can a verdict for the defendant be directed." *Moate v. H. L. Green Co.*, 95 Ga. App. 493, 500 (2) (98 S. E. 2d 185). It is strenuously contended that the plaintiff's evidence points equally toward opposing theories; that is, whether a fall caused the heart attack or whether a heart attack caused the fall. If the latter, of course, the death would not be the result of accident within the meaning of the policy, but if the former, the plaintiff could recover under the terms of the policy, which does not demand either that an accident cause the death independently of all other causes, or that the accident be evidenced by violent, visible and external means. The direct opinion evidence of one medical witness was that a fall to the floor caused acute heart failure. It is argued, however, that this witness must assume a fall before inferring it as the cause of the heart attack (the heart attack being admittedly the immediate cause of death) and that this is pyramiding an inference on an inference. In *Lumbermen's Mutual Casualty Co. v. Bridges*, 81 Ga. App. 395, 401 (58 S. E. 2d 849) it was stated in a similar state of facts: "We think that these inferences are collateral, virtually only one inference, and that the problem of basing one inference on another is not involved. But if it is true that the inference that the exertion contributed to the death is an inference based on the inference that the employee died of heart disease, neither inference is too remote and complies with the test of validity, having as a basis the connection of cause and effect and the observations of human experience." The witness here, in arriving at his opinion, would necessarily weigh certain probabilities, as also would the jury in reaching a verdict in the case. The probabilities, from the witness's point of view, concerned the undoubted injury to the toe and whether this was caused by disease or by trauma; the probability of accident in getting out of bed in view of the extent of injury to the toe and the amount of blood spilt; the probability that a man who has a heart attack while in bed

will not attempt to get out of bed, but will lie down; the probability of injury being connected with a fall rather than with a heart attack; the probability or improbability of receiving such an injury *after* the onset of the attack and after the patient had already gotten out of bed onto the bare hospital floor; the probability that a fall will precipitate such an attack; the fact that dead men do not bleed, and the probability of one who has already suffered a heart attack being so injured and bleeding copious amounts thereafter during the progress of of the fatal attack, and so on. From all the facts and circumstances the jury have the right to choose the more likely inference; either that the insured injured himself during a fall, thus precipitating the attack, or that he had an attack and thereafter injured himself in any manner the jury would be authorized to find this might have occurred. And it might well be added in support of the *Bridges* case, supra, that while Judge Powell in *Georgia Ry. & Electric Co. v. Harris,* 1 Ga. App. 714 (3) (57 S. E. 1076) stated flatly that "an inference resting only upon an inference is not permissible," he later in *Lee v. State,* 8 Ga. App. 413, 419 (69 S. E. 310) referred to the statement as "a doctrine, however, of limited applicability, and, indeed, of doubtful soundness." The trial court erred in directing a verdict in favor of the defendant as contended in special ground 7 of the motion for a new trial.

■ Error is assigned in ground 4 of the amended motion for a new trial on the ruling of the trial court disallowing an amendment to the petition. Objections to rulings on pleadings are not proper grounds of a motion for a new trial. *Kelly v. Strouse & Bros.,* 116 Ga. 872 (6) (43 S. E. 280). The fourth special ground is without merit.

■ Whether or not insurance companies take into consideration the condition of the applicant's heart in issuing accident insurance policies has no relevancy to this case, the issue being whether the death is compensable within the terms of the policy. It was not error to exclude this evidence as set out in special ground 5, and the same is true of the evidence the exclusion of which is assigned as error in special ground 6.

The trial court erred in overruling the motion for a new trial.

*Judgment reversed. Nichols, Bell, Frankum and Jordan, JJ., concur. Felton, C. J., and Carlisle, J., dissent.*

CARLISLE, Judge, dissenting. I think that the trial judge properly directed a verdict for the defendant in this case. In the view which I take of the evidence, there was no testimony introduced which would authorize a jury to make a finding in favor of the plaintiff. Insofar as is material to this question, the record clearly shows that an autopsy was performed on the deceased and that it revealed, among other things, that no bruises or broken bones or other evidence of traumatic injury, aside from the bleeding of the raised toenail, was found on Mr. Halligan's body. Based upon the autopsy, the immediate cause of death was listed as "acute and old myocardial infarction," with the secondary cause given as "generalized arteriosclerosis." As testified to by one of the doctors, Mr. Halligan died of heart failure, "I would say it was acute heart failure and he had evidence of chronic heart failure also, his death was, of course, due to acute failure."

The expert medical witnesses were asked whether the pain attendant upon the raising of the toenail would have been sufficient to have induced a heart attack in a man in the condition Mr. Halligan was in, and these witnesses testified that pain does put some stress upon the heart of anybody and that the pain attendant upon the raising of a toenail sufficient to cause the bleeding found could have been a cause of Mr. Halligan's fatal attack. One of the medical witnesses testified at length as to the mechanics of a person's heart, how it pumps blood, and as to what happens when a person suffers what in common parlance is referred to as a heart attack. He testified in this regard that the occurrence which ultimately produces death by "heart attack" begins several hours or even days before death ensues, and that when a person suffers a heart attack the pain is usually so severe that the natural tendency is either to sit or lie down immediately and that the patient usually clutches his chest in pain and would tend to crumple to the floor rather than to fall precipitately.

The only evidence of accident in this case is the evidence of of the raised toenail. This is true because there was absolutely

no evidence as to how the deceased got out of the bed or that he fell out. With respect to the toenail, however, how it became raised, and when, is left purely to speculation. Whether it occurred before, and caused, or after, and resulted from the insured's acts on account of the onset of the fatal heart attack does not appear from the evidence. The jury would have to answer these questions by inferring one way or the other. The burden was on the plaintiff to prove her case; that is, to prove that Mr. Halligan suffered an accidental bodily injury which occasioned his death. *Code* § 38-103. The proof of this essential fact in this case is dependent wholly upon circumstantial evidence. But the circumstantial evidence introduced is as consistent with the theory that the injury to the toenail was inflicted by the actions of the insured subsequently to the onset of the heart attack as that it was inflicted by some occurrence prior thereto; such circumstances prove nothing. *Woodruff v. American Mutual &c. Ins. Co.,* 67 Ga. App. 554, 557 (21 S. E. 2d 298); *Martin v. Medlin,* 83 Ga. App. 589, 592 (64 S. E. 2d 73); *Chancey v. Shirah,* 96 Ga. App. 91, 93 (1) (99 S. E. 2d 365). Furthermore, in order for a jury to find for the plaintiff in this case, it would not only be necessary for them to infer from the evidence introduced that this injury preceded the heart attack, but to further infer that the injury contributed to the heart attack. The pyramiding of such remote inferences will not be permitted in order for the jury to arrive at a verdict. *Georgia Ry. & Electric Co. v. Harris,* 1 Ga. App. 714 (3) (57 S. E. 1076); *Spruell v. Georgia Automatic Gas &c. Co.,* 84 Ga. App. 657, 663 (67 S. E. 2d 178); *Miller v. Gerber Products Co.,* 207 Ga. 385, 388 (62 S. E. 2d 174, 52 A. L. R. 2d 155). The trial court did not err in directing a verdict for the defendant.

The majority opinion implies that this rule of law stated above no longer is of force in Georgia, and they cite the parenthetical statement of Judge Powell in *Lee v. State,* 8 Ga. App. 413, 419 (69 S. E. 310) in support of that position. However, careful reading of that case does not reveal that it was Judge Powell's intention to overrule the statement of the rule applied in *Georgia Ry. & Electric Co. v. Harris,* 1 Ga. App. 714 (3) (57 S. E. 1076), and I find no case which has done more than

lay aside the rule in that case on the basis of well defined distinctions. On the other hand, a case which is to my mind on "all fours" with the instant case from the standpoint of its juridic facts relating to this question is *U. S. Fidelity &c. Co. v. Davis,* 99 Ga. App. 45 (107 S. E. 2d 571) (a case written by the writer of the majority opinion in this case), where this rule, that is, the inhibition against basing a finding of the ultimate fact upon the pyramiding of two or more inferences was so aptly and properly applied. Equally applicable is the case of Phillips v. Travelers Ins. Co., 288 Mo. 175 (231 S. W. 947).

I think that, in fairness to the litigants in this case, it must be said, first of all, that the statement of the medical witness quoted at length and with emphasis in the majority opinion was itself based on a hypothetical question which *assumed* that Mr. Halligan fell heavily to the floor prior to the heart attack, and *assumed* that he injured his toe in the manner in which it was shown that the toe was injured *prior* to suffering the heart attack. The majority opinion also lays great stress upon the fact that this medical witness testified that a person would not bleed as much as Mr. Halligan bled, after death, but there was not one scintilla of evidence in this case to the effect that a person suffering a heart attack dies instantaneously upon suffering such a heart attack. The testimony thus relied on is not inconsistent with the inference that Mr. Halligan suffered the heart attack from which he died, and in crumpling to the floor caught his over-long and untrimmed toenail on his stocking, thus pulling the toenail up from its bed. Nor is a contrary inference more logical. Furthermore, the fact that Mr. Halligan's feet were near the bathroom door and his head near the foot of the bed, to my mind admits of only one conclusion, and that is that he fell either before or after suffering the heart attack while returning from the bathroom after having gotten out of bed. I do not see how the jury could logically conclude that he fell out of bed in such a manner as to place his body in the position in which it was found.

Secondly, much weight is given by the majority to the matter of the torn stocking. The nurse who came into the room when Mr. Halligan's body was first found testified that the toe of

the stocking on Mr. Halligan's foot from which the bleeding came was torn when she first saw it. The witness did not testify that she looked at the stocking closely enough to ascertain this fact when she first found Mr. Halligan's body, and I do not think that her testimony in this regard is sufficient to raise a conflict in the evidence as to whether the stocking was torn when Mr. Halligan fell or hurt his toe, or at some other time, when such testimony is considered in the light of the positive uncontradicted testimony of the superintendent of nurses in the hospital that she tore the toe of the stocking herself in order to ascertain the source of the bleeding after Mr. Halligan's body had been placed on the bed by the orderlies.

To paraphrase the language used in *U. S. Fidelity &c. Co. v. Davis*, 99 Ga. App. 45, supra, the evidence relating to Mr. Halligan's being on the floor with his toenail torn was equally consistent with the fact that he suffered a heart attack and crumpled or fell to the floor and pulled his toenail up *after* the attack, as it was with the fact that he pulled his toenail up and fell to the floor *before* having the attack. Since, under the view which I take of this case, there was no evidence at all that would indicate which of these events occurred first, and since to sustain her case it was necessary for the plaintiff to show that the accident occurred first and further that it had some causal connection with his death, I think that the inference that it occurred before the heart attack was too remote to support the further inference that it likewise had any causal connection with his death. I think that the facts in this case are clearly distinguishable from cases like *Lumbermen's &c. Casualty Co. v. Bridges*, 81 Ga. App. 395 (58 S. E. 2d 849), and those cited therein on p. 401, workmen's compensation cases, where the employees were shown by direct evidence to have engaged in physical exertion which was followed either directly or within a reasonable time by a heart attack producing disability or death. For these reasons, I dissent from the judgment of reversal in this case.

Felton, C. J., concurs substantially in this dissent.