154 So. 792

### SOUTHERN RY. CO. v. GLENN.
### 6 Div. 408.

Supreme Court of Alabama.
May 17, 1934.

Taylor & Higgins and Chas. W. Greer, all of Birmingham, for appellee.

Stokely, Scrivner, Dominick & Smith, of Birmingham, for appellant.

THOMAS, Justice.

The trial was had on count A, which declared for homicide under the Federal Employers' Liability Act (45 USCA §§ 51–59). Louisville & N. R. Co. v. Parker, 223 Ala. 626, 138 So. 231; Louisville & N. R. Co. v. Porter, 205 Ala. 131, 87 So. 288; Southern Railway Co. v. Lizzie Crawley (Ala. Sup.) 155 So. 568.

It will be observed that the Alabama scintilla rule of evidence does not apply (Louisville & N. R. Co. v. Parker, supra; Western & Atlantic Railroad v. Hughes, 278 U. S. 496, 49 S. Ct. 231, 73 L. Ed. 473); and that in such an action contributory negligence is not a bar to recovery, unless it is the sole proximate cause of the injury or death. Louisville & N. R. Co. v. Parker, 223 Ala. 626, 138 So. 231; New York Central Railroad Company v. Marcone, 281 U. S. 345, 50 S. Ct. 294, 74 L. Ed. 892; Chesapeake & Ohio Railway Company v. Nixon, 271 U. S. 218, 46 S. Ct. 495, 70 L. Ed. 914; Toledo, St. Louis, & Western Railroad Co. v. Allen, 276 U. S. 167, 48 S. Ct. 215, 72 L. Ed. 513, 515; Atlantic Coast Line Railroad Company v Davis, 279 U. S. 34, 49 S. Ct. 210, 73 L. Ed. 601, 603; Unadilla Valley Railway Company v. Caldine, 278 U. S. 139, 49 S. Ct. 91, 73 L. Ed. 224; Atlantic Coast Line Railroad Co. v. Driggers, 279 U. S. 787, 49 S. Ct. 490, 73 L. Ed. 957; Federal Employers' Liability Act (45 USCA §§ 51–59).

The locus in quo is described by Mr. Pannell, the locomotive fireman in charge and on duty when the injury occurred, as follows:

"I knew a man by the name of Charlie Glenn during his life time. He was in my crew, on the night he was killed. He was employed in the capacity of switchman. I know

where 37th Street crossing in Birmingham is. This accident happened near that crossing, or a little west of it. * * * On the night of the accident, we had been down to Mc-Wane's and had gotten five cars and put them on No. 2 track. They were just standing there east of 37th Street crossing. I believe the L & N had placed seven cars on No. 2 track somewhere west of 37th Street crossing. In any event there were some cars down there. I found that out after I hit them. After I had brought these five cars up to No. 2 track, I went back into McWane Pipe Shop to work a while. I brought out two more cars. When I came out with those two cars, the whole crew came out with me. * * * Mr. Glenn, the dead man, was standing on the front footboard on the right side of the engine as we came out, the engine being headed east. The front footboard sticks out in front of the engine. * * * Mr. Ray was the switchman working on the head end. Mr. Glenn was the switchman working on the rear end. Mr. Glenn, who had been standing on the engine, got off of the front footboard when the engine passed over the 37th Street crossing. He stepped off on that crossing and the engine kept moving at a slow speed. * * * We had an engine and two cars hooked on to it and we carried those two cars to where we got on to No. 2 track, where Ray got down out of the cab and threw the switch and got back, and gave us a come-on signal. Ray caught the rear end of the two cars as we came back on No. 2. That was the correct position for him to be in. * * *

"He didn't go back up there, but he gave me the back-up signal from the second car and he never did move until after the accident to get back up to the end of the fifth car. * * *

"Mr. Glenn did call to Mr. Ray. As well as I understood, Mr. Glenn said: 'Hey, Ray, I am going to drop off here and look out for the L & N cut.'"

■ The real question in the case relates to the action of the court in refusing to give, at the request of the defendant, the following written charge: "If the jury believe the evidence in this case, they will find for the defendant." It will be necessary to note that the record discloses that Mitchell, the conductor in charge of the train, to whose orders and directions intestate was required to conform, directed intestate, on the occasion of the injury, to drop off and make coupling at the L. & N. cut; that it was the duty of intestate to remain at the end of said cut to make the required and necessary coupling, and to protect the movement of that train; that witness Mitchell said: "I was going down the line and making that record. At the time this accident occurred, I was at the rear car of the L & N cut. I had just booked the rear car. There were seven cars in the L & N cut. I was booking the rear car, and putting the book in my pocket just as the accident happened. I saw him just as he went in between these cars when the accident happened. It happened just about the time he got in there. I don't know how soon in point of time from the time he went in there until the accident happened. It was so quick I can't tell you how much time elapsed, but just as soon as I saw him step in there the cars hit. His lights were sitting on the side of the track on the ground. He had a red light and a white light. They were at the third car. Before that time I hadn't paid any attention to him. I was booking my cars. I didn't know at that time that he was not up there at the other end of the L & N cut."

The evidence further showed that intestate remained on the cars until they reached Thirty-Seventh street crossing, approximately two hundred feet in an easterly direction from the McWane gate, and that at such time and place "Mr. Glenn was riding on the footboard with me then, on the back of the engine and he said: 'Ray, I will get off and look out for this crossing and line the main line switch. You go ahead.' Of course, it was not necessary for him to say that. Glenn got off pretty close to the switch, which is just east of the crossing. There is just a little space between the switch and the crossing. Glenn said he would look out for the crossing and make the coupling with the L & N cut. It was Mr. Glenn's place to make coupling with the L & N cut. Mr. Glenn had theretofore customarily made the couplings at the back end of the train and I made couplings at the front end of the train. After Glenn got off, the train proceeded on in an easterly direction about 400 or 500 feet or maybe more than that, up to the main line switch, up to where you back into the yard. We were several hundred feet up there any way. We backed in on No. 2 track or the L & N transfer track. That is the place where the L & N cars were standing. It was on that track that the coupling was to be made. While we were going on up to back in on No. 2 track, after leaving the road crossing, Mr. Glenn was not with me. He got off. * * * I know what the duties were of the man who was to make the coupling at the rear end. I

know what his duty was with reference to flagging; that is the duty of the field man. He is supposed to make the couplings and then after he makes the coupling the air hose have to be coupled; he couples those and goes to the rear end of the train and places his red light on the rear end and gives the engineer a signal to go ahead. The air hose is coupled after the engine is attached. I couldn't see the end of those cars while we were backing down there. It was dark. Those L & N cars did not have a light on them anywhere. There was no light other than the lights that the switchman had in his hands that I could see. I had a light in my hand. There was no light on the cars. There was no light on the road crossing, anywhere. There was no light anywhere about there except the light the switchman had. It was the duty of the field man to make the coupling. He was also supposed to slow the engineer down when he went to make the coupling so he would not hit the cars too hard. * * * As we came down the track, I could see Mr. Glenn's lights. I didn't know whether he had gotten down to the end of the cars or not. I didn't know that he had passed beyond the end of the cars about for four or five car lengths. Mr. Glenn did not give any signal at all to slow the engineer down. He did not give me any signal at all to warn me of the location of the L & N cut. After we had come in on No. 2 track and had coupled with the five cars that were standing there, together with the two we already had, I got a signal to back up. That signal was from Mr. Glenn and that was the last one I got. I passed this signal on to the engineer, who operated on my signals."

The evidence showed that intestate worked at the rear of the train and the switchman, Ray, at the front end or the end nearest the engine, and that it was intestate's duty to protect the movement of the train in its backward motion of shifting and coupling cars on such switch tracks; that after the engine passed Thirty-Seventh street, it proceeded eastward to the point of the switch, then shifted and entered No. 2 track and reversed the cars, backing westward for the purpose, and toward the L. & N. cars standing on that track and to which intestate was to proceed to couple and guard. The switchman Ray testified, as we have indicated, that deceased gave him the back-up signal and that he passed that signal on to the engineer, who proceeded with its execution by backing westward toward the standing L. & N. cars. In the meantime the deceased had gone, walking

in a westerly direction with two lighted signal lanterns in his hands, passed the east end of the L. & N. cut of standing cars; and the conductor stated, set the two signal lights on the ground by the side of the cars and went between them, while his backing signal was being executed by the engineer and without a signal for a slow down or easy coupling. He went between the cars just as the impact occurred, and the engineer and switchman mistook the lights, which shone from the ground, to be in the hands of intestate, and assumed that he would give a slow down signal for the purpose of coupling the cars; he was caught in the impact of the cars, causing his injury and death.

It is no doubt a fact, as stated by the engineer and other switchman in charge of the movement of the train and the discharge of duty in that connection, that they had received the first signal to reverse for approach and for coupling; that they saw the two signal lights on the ground, mistook them for lights in the hands of intestate, and were looking for a slow down signal for the purpose of easy coupling when nearing or reaching the usual and proper point for coupling—but that this signal was never given.

The evidence shows there were no other lights or signals that would have indicated or warned that intestate was going between the cars for an examination of the air brakes before coupling of the cars was accomplished. The fact that the air hose to some of the cars east of the point of injury had been coupled, but that those further west were not coupled at the time of intestate's death, afforded an inference that intestate was proceeding with or making the air couplings as he went to the point at which the coupling was to be made.

■ It is true that the violation of a rule was not more than contributory negligence. However, intestate's conduct was more than a mere violation of an order which it was his positive duty to obey. He not only violated the rule at his post of duty, but went between the cars where he then had no duty to perform, at a point where he had no right at the time to be, and where his fellow employees may not assume that he would be imperiled and injured. The two lighted lanterns wrongfully placed by intestate beside the cars *was the positive assurance* by him that the lanterns were in his hands and signals given were to be obeyed and the execution thereof continued. That is to say, that he was in a safe position at his post of duty beside the track; that the point of impact had not been

reached; that the end of the L. & N. cut of cars was a safe distance from the rear of defendant's train; and that those in charge could proceed with the assurance that another and slow signal would follow for the purpose of making the coupling at the proper time. It appears from this that plaintiff's intestate's negligence was the sole and proximate cause of his injury and death, and comes within the rule of the federal cases cited above.

We have indicated that plaintiff had a tendency of evidence that intestate had gone between the cars to couple or inspect the air line or hose preparatory to a proper movement of the cars after coupling. We have also indicated the reverse order was the proper course. The witness Pannell says of this: "It was Mr. Glenn's duty to couple up the coupling and to go over and see that the air hose were coupled. The time for him to perform that duty and the time which was customary for him to perform that duty was after the engine was coupled to the cars and then he would go over them and examine them to see if they were ready to move; that was the customary way to work unless it was agreed otherwise."

The witness Ray gave like testimony as to intestate's duties, which consisted, first of coupling the cars, then going over and examining the air hose to see if movement may be properly made.

Witness Mitchell said in this connection:

"The air hose has to be coupled before the train is moved. Mr. Glenn would aid in coupling the air hose. After the cars are all coupled together, you stretch them out to see that you have got them all. It was Glenn's duty to remain at the end of the cut until the cars were coupled and to protect the train as it came back. It was not a part of his duty to couple the air hose before the cars were coupled up. It was strictly against the rules. It is not even permitted by car inspectors. As a matter of fact, when you go in between cars, you are protected by a blue flag. * * *

"I couldn't say whether the air hose on those seven L. & N. cars were coupled when they were delivered there. I don't know at all about that one way or the other."

■ The evidence shows no order to the contrary as to making coupling of the cars and then examining the air hose. And the long experience of intestate and his familiarity with that custom or rule gave assurance to his coemployees that he would so comply, and on which they had the right and did act to his injury. Davis, Agent, v. Sorrell, 213 Ala. 191, 194, 104 So. 397, and Federal authorities; Pennsylvania R. Co. v. Goughnour, 208 F. 961, 126 C. C. A. 39.

■ There was evidence in the nature of impeachment propounded to witness Ray, denied by him and affirmed by the witness Jones and another. The further question was asked the witness Jones, and answered in the negative by Ray:

" 'I will ask you if you didn't ask Mr. Ray then and there in the presence of Mrs. Glenn, "Wasn't he supposed to give you a signal before you backed up?" '

"The witness: 'Yes, sir.' * * *

"I then said: 'Why didn't you wait for the signal?'

"Mr. Ray said: 'Mrs. Jones to save my life, I just don't know.' "

On this, witness Ray was impeached by Mrs. Jones. There was a question answered in the negative by Ray and likewise impeached by Mrs. Glenn. Whether or not this may have raised a conflict under the scintilla rule in this state (McMillan v. Aiken, 205 Ala. 35, 88 So. 135) need not be determined. Such scintilla rule does not obtain in suits under the Federal Employers' Liability Act. Louisville & N. R. Co. v. Parker, supra; Southern Railway Co. v. Crawley, supra; Jones v. Bell, 201 Ala. 336, 77 So. 998. It is not sufficient under the federal authorities and the rule that obtains. Southern Railway Co. v. Crawley, supra; Louisville & N. R. Co. v. Parker, supra.

There was error in declining the general affirmative charge requested in writing by the defendant, and the judgment of the circuit court is reversed and the cause is remanded.

Reversed and remanded.

GARDNER, BROWN, and KNIGHT, JJ., concur.