160 So. 248

## METROPOLITAN LIFE INS. CO. v. HALSEY.
### 8 Div. 644.

Supreme Court of Alabama.
Feb. 28, 1935.

Rehearing Denied March 28, 1935.

Eyster & Eyster, of Decatur, and Andrews, Peach & Almon, of Sheffield, for appellant.

Thos. C. Burns, of Tuscumbia, for appellee.

THOMAS, Justice.

The trial was upon count 5 and pleas in short by consent.

The errors assigned were for the refusal of general affirmative charges and the refusal of motion for a new trial.

Count 5 contained, among other necessary averments, "that said paralysis is the proximate result of said accident, and independently of all other causes, and by violent and accidental means; * * * that his said disability was *directly caused by said accident independently of all other causes and was not caused either wholly or partly by any disease bodily or mental infirmity, or medical or surgical treatment therefor*, for which said injuries the defendant agreed in its policy to pay this plaintiff." (Italics supplied.)

The burden was upon plaintiff to show an accident which was the sole cause of the disability alleged.

The policy, which is exhibited and aids the complaint, recites: "This policy provides indemity for loss of life, limb, sight, or time, through injury by accidental means as herein limited and provided, * * * against the results of bodily injuries sustained while this policy is in force and *caused directly and independently of all other causes by violent and accidental means*." The partial disability clause provides that: "If such injuries shall not result as specified in Clause 1 (Loss of life, limb, sight), but, direct and independently of all other causes, shall, within two weeks from the date of the accident or immediately following total disability, continuously disable and prevent the insured from performing some *one or more important daily duty or duties* pertaining to his occupation, the Company will pay the insured *one-half of the weekly indemnity* above specified for the period of such partial disability, not exceeding 26 weeks." (Italics supplied.) There are also provisions for notice and final proof of claim.

The law of such a case has been indicated in our decisions: Standard Acc. Ins. Co. of Detroit, Mich., v. Hoehn, 215 Ala. 109, 110, 110 So. 7; Benefit Ass'n of Ry. Employees v. Armbruster, 217 Ala. 282, 116 So. 164; First Nat. Bank of Birmingham v. Equitable Life Assur. Soc. of United States, 225 Ala. 586, 144 So. 451; Prudential Ins. Co. v. Calvin, 227 Ala. 146, 148 So. 837; Metropolitan Life Ins. Co. v. Blue, 222 Ala. 665, 133 So. 707, 79 A. L. R. 852.

The weight and credibility of expert testimony, and when affirmative instruction requested should be given or refused, were the subjects of the recent decisions by this court— testimony, when given by an expert, being held undisputed, directly or indirectly, and based upon scientific processes, methods, and knowledge *when there is no reason for the exercise* of common knowledge against it— and the affirmative charge on the question involved, with hypothesis on belief of evidence, held should be given on due request. McMullen et al. v. Daniel (Ala. Sup.) 155 So. 687 [1]; Commonwealth Life Ins. Co. v. Harmon, 228 Ala. 377, 153 So. 755, and authorities; Harris v. Nashville C. & St. Louis R. Co., 153 Ala. 139, 143, 44 So. 962, 14 L. R. A. (N. S.) 261; Lawson v. Mobile Electric Co., 204 Ala. 318, 85 So. 257; Louisville & Nash-

---

[1] 229 Ala. 194.

ville Railroad Co. v. Marbury Lumber Co., 125 Ala. 237, 28 So. 438, 50 L. R. A. 620; Alabama Great Southern R. R. Co. v. Hill, 93 Ala. 514, 523, 9 So. 722, 30 Am. St. Rep. 65; Atlantic Coast Line R. Co. v. Jackson, 225 Ala. 652, 144 So. 813; Metropolitan Life Ins. Co. v. Chambers, 226 Ala. 192, 146 So. 524.

The respective tendencies of evidence are to be considered:

Plaintiff's evidence tended to show that on September 16, 1931, plaintiff was an occupant of a car that was caused to run into a tree, straining the ligaments of the small of his back and neck; that he had not recovered therefrom at the time of the trial; that the occupants of the car changed a tire and straightened up a fender and drove on to town; that plaintiff said he was injured and suffered continuously from pains in his back and neck; that on the night of his injury he could not sleep until about 2 or 3 o'clock in the morning; he went to his store the next morning; could not walk or use his hand; had lost the use of his right side; that his wife came and carried him home, and he was confined to his bed about six weeks, and not able to do anything for the time indicated; that he received no other injury between the time he had the lick and the time he was at the store; that after a period of six weeks he went back and forth to his business; that he could not write when he gave the required preliminary notice of his injury, and had to sign by his mark. Thus he concisely states his physical condition and period of recovery: "I was totally disabled from performing those duties for the first week, the second week, the third week, the fourth week, the fifth week and the sixth week after the accident. After that I would go down and supervise the work but I was not able to do any of it. I don't think I was able to supervise the work in the fifth week. I was able to go down there the sixth week. During the seventh week I was able to go down, ride down. I was not able to walk but had to ride down. In the eighth week I had to ride down. In the ninth week I could walk a little, but rode most of the time. I was able to walk down the tenth week and the eleventh week." Plaintiff admitted he was in the hospital in 1929, and the doctor advised that he had high blood pressure; denied that he had a cerebral hemorrhage, but was totally paralyzed on the right side as the result of his injuries.

The witness Hyde, the driver and an occupant of the car, testified that apparently no one was hurt; that complainant said his neck was giving pain, and aside from this no damage was done by the collision to the occupants of the car; that he later visited plaintiff during his confinement to his home from his injuries.

Defendant's evidence was by Dr. Greer, who said that in 1929 he found plaintiff suffering "with a moderately elevated high tension blood pressure"; found traces of "albumin and granular cast" in his urine, a symptom of diseased kidneys, a chronic condition of nephritis which produces, causes, or contributes to a condition of hardening of the arteries; that he was called to plaintiff's home on September 18, 1931, and found him suffering with a cerebral hemorrhage; that he did not "recall finding any bruises or traces of lacerations or skinned places on him at any place"; thought these diseases of his arteries contributed to the cerebral hemorrhage; that his "judgment and opinion is that these diseases, the hypertension and nephritis and high blood pressure, *operated to contribute to the cerebral hemorrhage he had on the morning of September 18, 1931.* That is my opinion and judgment." (Italics supplied.)

And on cross-examination the witness testified:

"I had not been called in since 1929, and the condition I treated him for was kidney trouble. It is a fact that this kidney trouble will cause hypertension and when that situation is cleared up the hypertension will disappear. *If that condition had ever occurred again I have not been called about it. A sudden jerk or wrench will create a hemorrhage of the brain, if it were severe enough.* I know that Mr. Halsey had a hemorrhage. I examined him. I did not examine his neck so closely." (Italics supplied.)

"If after my examination of Mr. Halsey in 1929 he was examined in 1930 and his blood pressure was found at that time to be 200 or better, that would show a progression of the disease. I said that I dismissed Mr. Halsey as being improved. I did not dismiss him as being cured."

"A dangerous stage of high blood pressure is considered around 200. People do not temporarily have that condition so high as that. Blood pressure varies according to size. If a man drinks whiskey his blood pressure runs up and if he excites himself it runs up. Frequently those are temporary conditions and caused from temporary drinking or some temporary disorder of some sort and that can be eliminated by treatment."

Dr. W. M. Pierce, after qualifying as a physician, testified that he examined Mr. Halsey in 1929, and again in 1930; that he took Mr. Halsey's blood pressure and found it to be a little over 200, which was an excessive blood pressure for a man of plaintiff's age and which would predispose him to a cerebral hemorrhage. "That is the natural and expected result of high blood pressure—a cerebral hemorrhage."

Witness expressed the professional opinion that:

"If a year from the time I saw Mr. Halsey he had an accident in which his head was not busted and there was no blow on the head, but in which there was a slight wrenching of his neck and back, and the second day after the accident he developed paralysis of his leg and right hand, *in my opinion* his high blood pressure would be a contributing cause if he had it at that time—at the time of his injury. As to whether blood pressure of 200 in a man Mr. Halsey's age is apt to continue it would depend of course on how he followed treatment and diet and on his every day work. If he did not follow a diet prescribed by his doctor his blood pressure would probably continue high without he had some other source of infection that produced this and he got rid of that infection. Blood pressure of that type and a hardening of the arteries usually go together. In a man of Mr. Halsey's age once the hardening of the arteries had set in I do not think there would be any way of doing away with that. *I think it would still be with him.* If he did not have the proper diet and proper treatment the tendency would would be for it to increase." (Italics supplied.)

And on cross-examination:

"Yes, it is a natural thing for a man as he grows older for his blood pressure to rise. It is not necessarily a natural thing for his arteries to harden. You find it in a great many cases, however, in numerous cases. They are a good deal harder at the age of sixty-five than eighteen. You sometimes see cases you could not tell much difference. It is hard to say if a man is suffering from a local disease and pus in his teeth whether that would create blood pressure at 200. Of course if he had other complications with it I might say it would. I think if he had albumin in his kidneys that would produce blood pressure. If Dr. Greer treated Mr. Halsey for those two diseases and he has straightened him up that blood pressure would have a tendency to go back to a normal state. I am examiner for the Metropolitan.

I went up there to examine Mr. Halsey after the accident."

And in response to question asked by the court, the witness testified further that, "The accident did not occasion the high blood pressure, but the high blood pressure could have caused the hemorrhage."

■ The notice and proof of injury given defendant and in evidence is not in conflict with plaintiff's testimony as a witness in his own behalf. If, however, there had been tendencies of conflict with his evidence given otherwise, a jury question would have been presented. Jones et al. v. Bell, 201 Ala. 336, 77 So. 998; Southern R. Co. v. Glenn, 228 Ala. 563, 567, 154 So. 792. It is sufficient to say of the evidence as a whole, that there were reasonable tendencies of conflict in plaintiff's and defendant's evidence, making a jury question. McMillan v. Aiken, 205 Ala. 35, 40, 88 So. 135. The opinions of the two experts, as given in evidence, did not exclude the reason and field for common knowledge and experience, as to the result of the recent collision, his pain and suffering, as against plaintiff's long-continued good health and lack of pain and physical inconvenience before and to the time of his injury. McMullen et al. v. Daniel, 229 Ala. 194, 155 So. 687; Commonwealth Life Ins. Co. v. Harmon, 228 Ala. 377, 153 So. 755.

We have examined the motion for a new trial and the evidence shedding light thereon, and find no error intervened in the overruling of the motion as to the refusal of the affirmative charge, the weight of the evidence, or the result and amount of the verdict rendered. Cobb v. Malone & Collins, 92 Ala. 630, 9 So. 738; Alaga Coach Line v. McCarroll, 227 Ala. 686, 151 So. 834, 92 A. L. R. 470; New York Life Ins. Co. v. Torrance, 228 Ala. 286, 153 So. 463.

The judgment of the circuit court is affirmed.

Affirmed.

ANDERSON, C. J., and BROWN and KNIGHT, JJ., concur.

### On Rehearing.

THOMAS, Justice.

■ The question of sole proximate cause was considered in Prudential Ins. Co. v. Calvin, 227 Ala. 146, 153, 148 So. 837, and it was there held that where there were conflicting tendencies of evidence as to the sole proximate cause of immediate death, a question

for the jury was presented. We have considered the effect of clause 9 of the policy as set out in the complaint, and hold that under the evidence the affirmative instruction requested by appellant was properly refused.

Application overruled.

ANDERSON, C. J., and BROWN and KNIGHT, JJ., concur.