158 So.2d 667

## LIBERTY NATIONAL LIFE INSURANCE COMPANY

v.

## Gladys M. REID.

**4 Div. 115 to 123.**

Supreme Court of Alabama.

May 30, 1963.

Rehearing Denied Dec. 12, 1963.

Robt. C. Reid, and A. R. Powell, Jr., Andalusia, and F. B. McGill, Opp, for appellee.

Spain, Gillon & Young and Ralph B. Tate, Birmingham, for appellant.

HARWOOD, Justice.

Suit below was for the recovery of double, or triple indemnities for accidental

death under the provisions of nine life insurance policies issued by the appellant company on the life of Edward F. Reid. The case was tried before the Hon. F. M. Smith, Judge of the Circuit Court of Covington County, without a jury.

After hearing, the court entered a judgment in favor of Gladys M. Reid, wife of the deceased Edward F. Reid, the beneficiary under the policies. The appellant's motion for a new trial being overruled, an appeal was perfected to this court.

The company had paid the face amounts of the policies, but had refused payment of the multiple indemnities on the grounds that a disease or infirmity from which Mr. Reid was suffering at the time of the accident cooperated with the accident to bring about Mr. Reid's death, and was an efficient cooperating cause thereof.

The evidence presented below tends to show that in 1942 Mr. Reid developed a malignancy of the lower intestinal tract. He was operated on by Dr. Alton C. Ochsner, Sr., and what is designated as a permanent enterostomy was done, that is, an opening was made in the left side of the abdomen and the lower intestine routed to the opening. Thereafter Mr. Reid wore a ileostomy bag for the purpose of catching the discharge from the intestine. The operation, under the medical evidence, was completely successful in eliminating the cancer, and this condition does not enter into our consideration.

In 1952 Mr. Reid's records at Ochsner Clinic showed evidence of heart disease, and in December 1958, Dr. Estep, his physician, diagnosed his heart disease as being a partial heart block, which had become complete by October 1959. Dr. Estep's diagnosis was confirmed by heart specialists at Ochsner's.

A heart block was defined by Dr. Ochsner as follows:

"Well, normally the heart beat originates in the auricle. There are four chambers of the heart, two auricles and two ventricles. The so-called pacemaker, the mechanism by which the beat is set up, normally is in the auricle. This is transmitted through a nervous bundle, which is called the 'bundle of Hiss,' which is described by a man by the name of Hiss. It's an electrical conduction from the auricle to the ventricle. In persons, usually as a result arteriosclerotic disease, there is an interference with this, there are changes in this neuromuscular bundle, and as a result of this there can be partial or complete interruption in this conducting mechanism. In such an instance, if it is complete, then the ventricle has to take over its own pacemaker, and it sets up its normal beat independently of the original beat."

One of the manifestations of a heart block is an Adams-Stokes syncope, which is defined as a fainting spell. Mr. Reid had suffered one or more fainting spells.

The evidence also shows however, that Mr. Reid, up until the day of his death engaged in a large and active law practice. He was president of the Covington County Bar Association. He participated in many civic enterprises and was widely known for his leadership in anti-cancer crusades.

It was Mr. Reid's habit to shave every morning while standing in a bath tub preparatory to taking a shower. While shaving he would hold his ileostomy bag in place with his one hand and shave with the other.

Mr. Reid's son testified that the tub was slippery and he himself had slipped in the tub several times while taking showers.

On the morning of the accident Mr. Reid and his son had slept the night before in the guest house on the Reid premises. His son occupied an upstairs bedroom, and Mr. Reid had slept downstairs.

At about 7:00 A.M., his son heard "banging" noises downstairs and ran down to his father's room. He found Mr. Reid in the tub with his head under the faucets. There was quite a bit of hot water in the

tub, the bathroom was warm, and the mirrors steamed up.

Mr. Reid had a bleeding gash over one eye, was "red as a beet," and in great pain, though conscious. Some of the skin had peeled off.

His son got Mr. Reid out of the tub, called Dr. Estep, and then called Mrs. Reid from the main house. Mrs. Reid testified she found pieces of skin floating in the tub water when she retrieved the ileostomy bag therefrom.

Dr. Estep arrived in a few moments, and gave Mr. Reid a shot for his pain, and then had him taken to the Andalusia Hospital. There medicines were applied to the burns and Mr. Reid was bandaged to the extent that he "looked like a mummy." Later in the day Mr. Reid was flown by an airplane ambulance to Foundation Hospital in New Orleans. There several doctors and surgeons attended him, including Dr. Ochsner. At about 11:30 that night Mr. Reid died.

Dr. Ochsner is in disagreement with the other doctors as to the efficiency of the heart disease in causing Mr. Reid's death.

Numerous medical records of Ochsner Clinic and Ochsner Foundation Hospital were received in evidence, and Dr. Moore, a cardiologist on the staff of each institution, and Dr. Ochsner, each testified by deposition, and testimony of Dr. Ochsner taken in another case was received in evidence by agreement.

Dr. Moore testified that he attended Mr. Reid from about 7:30 P.M., until he died. Asked the proximate cause of Mr. Reid's death, Dr. Moore stated: "It would be impossible to state a cause of death as far as I am concerned." The record shows Dr. Moore further testified:

"Q Would you state what your judgment as to the causes of death is?

"A The burns that were present were very obvious, and the laboratory studies done on admission confirmed the severity of the burns. In addition the records indicate he had had progressively severe heart disease by electrocardiograms, this disease presumed to have been arterio-sclerotic. My feeling is that the alteration secondary to the burns, plus the alteration in his conduction system secondary to his previous disease was such that the two together made it impossible for his heart to function adequately.

"Q You say your feeling, that is your best judgment?

"A My best judgment.

"Q Is this a correct statement, you are saying or have said in your judgment and opinion Mr. Reid's heart condition and the burns to his body actively cooperated to produce death at that time?

"A I think the heart disease alone would not have killed him; I think the burns alone would not have killed him; and if this is to be construed that the two together cooperated, I would say yes.

\*　　\*　　\*　　\*　　\*　　\*

"Q As to the cause of the death February 24 likewise the burns alone would have produced death?

"A I am not a burn doctor; don't get me in the position of saying I know how to treat burns, or that the burns alone would have killed him; I would not make a judgment as to the burns alone; I feel they would not have; but I do not feel able to render an honest opinion on that; that should be left to the surgeon."

Dr. Moore executed proofs of death submitted in several of the claims submitted by the appellee. On these papers he listed the cause of death as follows:

"Cause of death—(a) <u>Adams-Stokes syndrome.</u>
Due to　　　　(b) <u>Gastrointestinal hemorrhage.</u>
Due to　　　　(c) <u>50% 1° and 2° burns.</u>

\*　　\*　　\*　　\*　　\*　　\*

"Patient suffered fainting spell in shower at home resulting in severe

burns to upper part of body. This accident was not the direct cause of death."

The defense also introduced a letter of Dr. Kenneth K. Meyer, a surgeon on the staff at Ochsner's. In this letter Dr. Meyer stated:

"* * * It was the impression of the pathologist that the burns were not a direct cause of Mr. Reid's death. It was felt that the basic significant factor was the defect in the conduction mechanism of the heart, mainly the complete atrial ventricular block with Stokes-Adams syndrome, which caused the fainting in the shower through which he received first and second degree burns. As you probably know, after he was here in the hospital, he had another attack of this AV block with complete stoppage of the heart beat, which was restored by massage and electrical cardiac pacemakers. However, as is usual at the agonal contractions at death, at the time this AV block occurred he aspirated gastric contents into the tracheobronchial tree. The third factor was the massive gastro-intestinal hemmorrhage that was found. There was blood along the entire length of the gastro-intestinal tract, which had apparently occurred sometime before death. The source of this bleeding could not be found at autopsy and it is impossible to state what its relationship could have been to the fall. It was felt that the burns themselves were not sufficiently severe to have caused his death, at least in this interval. It is unlikely that any single one of the conditions found, namely the defect in the conduction mechanism of the heart, aspiration of the gastric contents, massive gastro-intestinal hemo..hage, or the first and second degree burns, would of themselves cause death.

"Although the burns were not a direct cause of Mr. Reid's death, the physiologic changes due to burns were undoubtedly a factor in his death. I think it would be very difficult to assess the exact importance of these but they certainly were a factor. * * *"

We note that Dr. Moore testified that the doctors he remembered as being in attendance upon Mr. Reid at Ochsner's were Drs. McKee, Webster, Ochsner, and himself. We infer that Dr. Meyer did not attend Mr. Reid.

The defense also introduced into evidence the death certificate on Mr. Reid, executed by Dr. Brumfield, a resident physician on the staff at Ochsner's, and the report of Dr. Carerra, a pathologist on the staff at Ochsner's.

Dr. Brumfield, in the death certificate listed (a) Adams-Stokes syndrome as the principal cause of death, with the syndrome being due to (b) gastrointestinal hemorrhage, and (c) 50% 1° and 2° burns. The report of Dr. Carerra was substantially in accord with the death certificate.

As before stated, the testimony of Dr. Alton Ochsner was both by deposition and his testimony in another case admitted into evidence by agreement in the present case. From both testimonials the tendency of Dr. Ochsner's testimony was that he first knew Mr. Reid in 1942, when he operated on him for the malignancy. They became friends and Mr. Reid was later made a director of the Ochsner Foundation

On the day in question, he first saw Mr. Reid about 2:30 in the afternoon. He was heavily sedated, and bandaged from his knees to his shoulders. His general condition was very good aside from the sedation. The bandages were not disturbed. "We were very much concerned about his burns," which were classified as first and second degree over about 50% of the body. Ordinarily, Dr. Ochsner said, one can't distinguish between second degree and third degree burns until time has elapsed because the degree of destruction caused by the burns is not known.

At 5:30 P.M., Mr. Reid appeared to be getting along fine and there had been no symptoms or flare up of his previous heart condition. Later while at dinner Dr. Ochsner received a call to return to the hospital as Mr. Reid had developed a cardiac standstill. He found that actually the condition was a fibrillation, a condition where the heart flutters. Mr. Reid's chest was opened and the heart massaged. Rhythm was restored. As a precaution electrodes were inserted for use as a pacemaker should it be needed. All this was done in Mr. Reid's room. He was then removed to a recovery room where he did quite well for two or three hours when a cardiac standstill developed which did not respond to treatment, and Mr. Reid died about 11:30 P.M.

Dr. Ochsner testified that Drs. Meyer, Moore, and Carerra were competent doctors, and "They would not be on my staff if they were not." However, he testified unequivocably that he was in complete disagreement with their conclusions and findings as to the cause of Mr. Reid's death.

Appellant in brief and argument lays great stress on the following statement by Dr. Ochsner on cross examination:

"Yes, I think that Ed Reid had heart disease, there is no question, but I think the aggravation of the heart disease by the burn, together with the burn shock, was what caused his death."

We think, however, that the true tenor of Dr. Ochsner's testimony as to the cause of Mr. Reid's death is to be gathered from the following excerpts from Dr. Ochsner's testimony:

"Q Now Doctor, from your knowledge of Mr. Reid, his physical condition, the treatment which was given to him there at that time, and your observation of his condition, what, in your judgment, was the proximate cause of the death of Mr. Reid?

"A There wasn't any question in my mind but what Mr. Reid died as a result of the burns he sustained and its complications.

"Q Now in line with those complications was an autopsy performed on Mr. Reid?

"A Yes, sir.

"Q Would you describe what findings, if any, there were as to hemorrhage?

"A Well, he had extensive gastrointestinal hemorrhage, which is a complication of a severe burn. It is one of the things we fear.

\*     \*     \*     \*     \*     \*

"Q Then it is your statement that the proximate or direct cause of the death of Mr. Reid was due to those burns and the massive gastrointestinal hemorrhage?

"A Yes. I do not think that Mr. Reid would have died had he not been burned and had the associated hemorrhage.

\*     \*     \*     \*     \*     \*

"Q Now did you understand this statement that 'cause of death primarily from complications following Stokes-Adams syncope.'?

"A I would disagree with the interpretation. I would say the cause of death was the burn. Mr. Reid had several attacks of Stokes-Adams syncope before and he never died, and he wouldn't have died then if he had not been burned. So I would disagree that the cause of death was due to Stokes-Adams syncope.

\*     \*     \*     \*     \*     \*

"Q Now Dr. Moore says 'I would guess that the entire series of events represented increasing severity of his heart disease and that the additional stress of his burns and hemo-concentration which he had was too much for the heart.' Is Dr. Moore just dead wrong there, Dr. Ochsner?

"A I think he is, in his reasoning, I do, because I think had it not been for the burn he would have survived and lived on as he had for many years.

\*   \*   \*   \*   \*   \*

"Q Well, as far as that goes, a complete heart block in and out of itself would have caused his death, wouldn't it?

"A Oh, yes, but he had had that for a long time.

"Q Well, people die of it don't they?

"A Oh, yes, but there is no reason why Ed Reid should have died of that.

\*   \*   \*   \*   \*   \*

"Q The AV block produces the cardiac arrest?

"A Well, the toxicity from the burn and the results of his hemorrhage I think produced the cardiac arrest, which caused his heart to go into standstill.

\*   \*   \*   \*   \*   \*

"Q And if it hadn't been for the disabled heart it probably wouldn't have caused his death that soon anyway, would it?

"A I don't think the disabled heart had anything to do with it. I think the complications of the hemorrhage and the pneumonitis which is complication of the burn.

\*   \*   \*   \*   \*   \*

"Q Then is it not a fact to that extent the pre-existing heart condition contributed to his death at that particular time?

"A It might to a very minor degree.

\*   \*   \*   \*   \*   \*

"Q Would you say this gastro-intestinal hemorrhage was a result or you might say was proximately caused by that extensive burn or burns?

"A There is not any question but what it was caused by the burns, a

rather common complication in severe burns."

. Dr. Ochsner further testified that two days after the autopsy on Mr. Reid's body, he had written Dr. Estep in Andalusia inquiring if Mr. Reid had been taking aspirin or any cold medicines containing aspirin, since this medicine could cause gastro-intestinal bleeding. Dr. Ochsner said he did not know what he was thinking of when he wrote the letter, that he might have been exploring something else. However, he further testified that he was present at the autopsy, and had observed the minute bleeding ulcers in Mr. Reid's intestinal tract, and it was perfectly obvious that this condition had resulted from the burns.

Four of the policies sued upon are what are commonly referred to as ordinary insurance, and the remaining five policies are ordinarily referred to as industrial insurance.

The ordinary insurance policies contained the following clauses:

"1. When Payable—The Double Indemnity for Death by Accident provided above shall be payable upon receipt of due proof that the death of Insured resulted directly and independently of all other causes from bodily injuries effected solely through external, violent and accidental means, \* \* \*.

"2. When Not Payable—The Double Indemnity for Death by Accident shall not be payable if the Insured's death resulted \* \* \* directly or indirectly, from infirmity of mind or body, from illness or disease, \* \* \*."

The five industrial policies contain the following provisions:

"Upon receipt of due proof that the death of the Insured has resulted directly, and independently of all other causes, from bodily injuries sustained solely through violent, external and accidental means, \* \* \* the Company will pay an additional benefit

* * * but no such accidental benefit shall be payable if death result * * * directly or indirectly from bodily or mental infirmity or disease in any form * * *."

■ In construing general clauses similar to the ones contained in the present policies, that is, "death resulting directly and solely from accidental means, exclusive or independent of all other causes," it is the doctrine of our cases that if the accident aggravated a disease and hastened the death of the insured, the accident is yet considered the proximate cause of the insured's death, notwithstanding the gravity of the disease or that the accidental injury would not have been fatal but for the infirmity. First National Bank of Birmingham v. Equitable Life Assur. Soc., of United States, 225 Ala. 586, 144 So. 451, and cases cited.

The Equitable case, supra, enunciates the further doctrine that where a policy contains the additional clause pertaining to death resulting wholly or in part, directly or indirectly, from disease or bodily infirmity, then if the disease, in cooperation with the accidental injury, is an efficient cause of death, then there can be no recovery.

However, as stated in the Equitable case, supra, by Bouldin, J., "But this does not mean that mere feebleness, nor predisposition to recurrence of former disease, nor every infirmity which may aggravate the effects of an accidental injury, is to be regarded as the cause of death," and further, "The general rules of construing insurance policies favorably to the insured apply to these clauses touching bodily infirmity, etc."

■ If an injury starts a chain reaction resulting in death, recovery may be had even if one of the links in the chain is old age, frailty and some links are dormant diseases or physical conditions without which the chain would be broken. Each case must be particularized. New York Life Insurance Co. v. McGehee, 5 Cir., 260 F.2d 768.

■ Where the evidence is conflicting as to whether an accident was the cause of an insured's death, or whether the accident and a disease cooperating therewith combined to cause death, then ordinarily a question of fact within the resolution of the trier of fact is presented. John Hancock Mut. Life Ins. Co. v. McCreary, 37 Ala.App. 493, 70 So.2d 817; Emergency Aid Ins. Co. v. Connell, 258 Ala. 521, 63 So.2d 603; Metropolitan Life Ins. Co. v. Halsey, 230 Ala. 193, 160 So. 248.

■ The testimony of Dr. Ochsner that Mr. Reid's heart condition was not a co-operating and efficient cause of death is in conflict in this aspect with the evidence of Drs. Meyer, Carerra and Moore. Dr. Ochsner's testimony in its import was clear and substantial. It fully supports the conclusion of the trier of fact. This being so, we would be unjustified in disturbing the findings in this regard, either in the rendition of the judgment or in denying appellant's motion for a new trial. National Life & Accident Ins. Co. v. McGhee, 238 Ala. 471, 191 So. 884; Provident Life & Accident Ins. Co. v. Downey, 242 Ala. 482, 7 So.2d 17; Emergency Aid Ins. Co. v. Dobbs, 263 Ala. 594, 83 So.2d 335; United Ins. Co. of America v. Ray, 271 Ala. 543, 125 So.2d 704.

Counsel for appellant also contend that the court erred in admitting into evidence plaintiff's exhibits 12 and 13. These exhibits were "Statement of Claimant," and also "Proof of Death." Each was executed on forms furnished by the company. The grounds of objection were that the claims did not constitute due proof that death resulted directly and independently of all other causes, and solely from accidental causes.

It appears that on that portion of the proofs to be executed by the claimant, cause of death was listed on exhibit 12 as "slipped in shower and was burned," and on exhibit 13 the cause of death was listed as "fell in shower and was scalded."

On exhibit 12, under the section to be executed by a physician the principal cause of death was stated to be, "Adams-Stokes Syndrome." On exhibit 13 under "Condition leading directly to death" was listed "Adams-Stokes Syndrome," with "gastrointestinal hemorrhage due to 50% 1° and 2° burns" being listed as antecedent causes. Dr. Charles B. Moore executed the physician's statements on the forms.

■■■ That portion of the claims executed by the claimant on forms furnished by the company were sufficient to apprise the company that the cause of death was accidental. While that section of the form executed by Dr. Moore shows a disease to be the cause of death, a claimant is not bound by a physician's statement furnished as part of proof of loss unless made at his request or ratified by him. See 45 C.J.S. Insurance § 982 (5), p. 1198. Further, a physician's certificate as to cause of death, while considered prima facie true is conclusive only if unrebutted. Cotton States Life Ins. Co. v. Crozier, 216 Ala. 537, 113 So. 615; Green v. Mutual Ben. Health and Accident Assn., 267 Ala. 56, 99 So.2d 694; National Sec. Ins. Co. of Elba v. Tellis, 39 Ala.App. 455, 104 So.2d 488.

It also appears from the evidence that when checks were mailed by the appellant covering payments due under the policies for death, but not including the multiple indemnity payments, correspondence ensued between the attorneys for the parties relative to the legend on the checks that endorsement thereof would constitute payment in full. The checks were returned, and redrawn. The attorney for the appellee in his letters stated that the appellee was claiming the additional indemnities payable in event of accidental death.

■ When an insurer takes notice of a claim, passes on it without objection as to its sufficiency, and offers to pay the primary liability, any question as to the form of proof is waived. New York Life Ins. Co. v. Turner, 213 Ala. 286, 104 So. 643.

Counsel for appellant also argue that the lower court erred in not sustaining appellant's demurrer to the two identical counts of each of the complaints. Counsel avers that each count failed to allege that death did not result directly or indirectly from disease, and that as to the five industrial policies the exception as to death from disease was incorporated in the general clause and should have been pleaded. Counsel relies upon Protective Life Ins. Co. v. Swink, 222 Ala. 496, 132 So. 728.

■ Without intimating that we agree with counsel's premise that a negative exception was incorporated in the main clause, we think it sufficient to observe that no ground of demurrer raised this point, and other than this alleged defect each count stated a cause of action and was sufficient against demurrer. See Equitable Life Assur. Soc. of United States v. Roberts, 226 Ala. 8, 145 So. 157.

■ The case was tried on the theory that Mr. Reid's heart condition was an efficient cause of his death. This theory was fully developed in the trial below. Even if there was a defect in the complaint as contended, both parties exercised full opportunity to, and did, present evidence on this issue, and the case was fully tried below on this theory. No error therefore of which appellant can complain resulted, and we must consider that the pleadings presented the theory. Federal Automobile Ins. Assn. v. Meyers, 218 Ala. 520, 119 So. 230.

Affirmed.

LIVINGSTON, C. J., and SIMPSON and MERRILL, JJ., concur.

On Application for Rehearing

HARWOOD, Justice.

In brief in support of the application for rehearing counsel for appellant argues strenuously that we erred in our judgment of affirmance of the judgment in that prop-

er recognition was not given to the doctrine of those cases which hold that if a disease from which an insured is suffering causes the accident which in turn produces injuries and death, then death results directly or indirectly from the disease which caused the accident.

In support of this proposition counsel cites the following cases: Knowlton v. John Hancock Mut. Life Ins. Co., 146 Me. 220, 79 A.2d 581; Halligan v. Underwriters at Lloyd's London, 102 Ga.App. 905, 118 S.E. 2d 107; Locker v. Equitable Life Assurance Society of United States, Sup., 136 N.Y.S.2d 652 (New York); Sullivan v. Metropolitan Life Ins. Co., 96 Mont. 254, 29 P.2d 1046; Lederer v. Metropolitan Life Ins. Co., 135 Pa.Super. 61, 4 A.2d 608; Mutual Life Ins. Co. of New York v. Hassing, 10 Cir., 134 F.2d 714; Russell v. Glens Falls Indemnity Co. of Glens Falls, N.Y., 134 Neb. 631, 279 N.W. 287; Goodes v. Order of etc., Travelers, 174 Mo.App. 330, 156 S.W. 995; Independent Life and Accident Ins. Co. v. Causby, 94 Ga.App. 305, 94 S.E.2d 388. These cases are supportive of the proposition urged by counsel.

■ However, we are here considering the judgment entered by the trial court sitting without the intervention of a jury. True, the evidence submitted was largely by deposition, and exhibits, in the form of hospital records introduced through the medium of these depositions, and therefore the finding of the court is not due to be accorded the presumption given the findings of a trier of fact based on evidence ore tenus.

Evidence introduced by the plaintiff tended to show that Mr. Reid, the deceased, always shaved standing up in the tub and that during such procedure it was necessary that he hold the ileostomy bag with one hand. The plaintiff's evidence further tended to show that the tub was slippery. Mr. Reid's son testified that he had slipped in the same tub several times.

■ In considering the propriety of the conclusions of the lower court, sitting without a jury and therefore in the capacity of a trier of fact, we review the tendencies of the evidence most favorable to the plaintiff, and must allow such reasonable inferences as a jury would have been free to draw. Under the plaintiff's evidence we think it permissible for the court to have reasonably inferred that Mr. Reid slipped in the tub while shaving. On the other hand, there was received in evidence a great mass of hospital reports from the Ochsner Clinic in New Orleans. As before stated these hospital and medical records were introduced through the depositions of several doctors at the hospital and at the time of the taking of the depositions it was agreed "that neither side raises the question of the authenticity of the records * * *." No objections to any portions of these hospital records were raised at the trial below.

In the "nursing notes" which constitute a part of the hospital records that came into evidence as above stated appears the following which was made immediately upon Mr. Reid's admission to the hospital:

"States he blacked out in shower and turned off cold water, left hot water on."

In the reports of Dr. Moore appears the following:

"On February 24, 1960, the patient was admitted to Ochsner Foundation Hospital. It was stated that while the patient was taking a shower he fainted. When he fell he turned the cold water off and consequently was severely burned. The patient was cyanotic and looked terminal. The pulse rate was 24."

Statements of similar import appear in the reports of Dr. Meyer and Dr. Carrera, Dr. Webster, and Dr. Brumfield.

During the cross examination of Dr. Ochsner at the time his deposition was taken he was asked if he had not testified at a previous trial in Andalusia that "A Stokes-Adams Syncope while bathing and accidentally turning on the hot water actually is what caused Mr. Reid to be burned." Dr. Ochsner answered that if the transcript so

**36**

showed he presumed he did, but that such an answer was purely presumptive and "We knew he fell. Whether he slipped or had had a Stokes-Adams Syncope, I do not know. I do not think anybody can tell us."

As before stated, the hospital records were admitted by agreement that there would be no question raised as to the authenticity of the records.

In Alabama, hospital records are admissible under the provisions of Section 415, Title 7, Code of Alabama 1940, relating to the admission into evidence of business records made in the regular course of business. This section provides further "All other circumstances of the making of such writing or record, including lack of personal knowledge by the entrant or maker, may be shown to affect its weight, but they shall not affect its admissibility."

In other states where, as in Alabama, hospital records are admitted under a business records statute, the courts have uniformly held that the admissibility of hospital records should be limited to entries recording the details of the diagnosis, and the medical and surgical treatment of the patient, and that data pertaining to the cause of the injury, unless essential to a diagnosis, should be excluded.

■ It is the view of the cases that since statements in hospital records pertaining to the manner of the injury are hearsay, and have no reference to the diagnosis or treatment of the patient, they should not be considered as records pertaining to the business of the hospital, unless pathologically germane to a diagnosis and treatment of the patient.

Clearly the hospital records are hearsay and inadmissible, unless under the provisions of Section 415, supra.

■ The history given by the patient upon admission as to the cause of his injury cannot be considered admissible as part of the res gestae, since such statements are made subsequent to the event. Nor are such statements admissible per se as an admission against interest in that the party to whom they were made is not present. In other words, the proper predicate is generally absent for the introduction of such statements as admissions against interest.

An excellent annotation entitled "Admissibility of Hospital Records relating to cause or circumstances of accident or incident in which patient sustains injury," commenting on innumerable cases to the effect as above set out, may be found in 44 A.L.R. 2d at page 553, and we will not burden this opinion with the citations of these authorities.

It is true that where the evidence before the court is not ore tenus, but as in this case by way of depositions, no presumptions arise in favor of the court's conclusions on such evidence if contradictory evidence is also present.

The present evidence as to the aspect of the history contained in the hospital reports was before the court by virtue of the agreement of counsel that no objection would be raised as to the authenticity of the hospital reports and because no objections were imposed to the historical statements in the court below. Had objections been interposed to such historical portions, that is, as to how the injuries occurred, such objections would have had to be sustained.

Under the procedure followed, the court had no opportunity to rule upon the admission of such evidence, which was inadmissible, though relevant. The question arises therefore as to what weight the lower court should have accorded this evidence in its determination of the issues.

■ This being a suit at law, the rules developed in equity cases pursuant to the provisions of Sec. 372(1), Tit. 7, Code of Alabama 1940, to the effect that in the absence of objections the court could consider only such evidence as is relevant, material, competent, and legal, do not apply.

Nevertheless, in International Agricultural Corporation v. Southern Ry. Co., 188 Ala. 354, 66 So. 14, a suit at law, this court

said, in reference to the question as to whether the terms of a bill of lading had been altered by a subsequent agreement:

"There was an attempt on the part of the plaintiff to show that the defendant did consent, but there was an utter failure so to do. There was offered no competent evidence to show that the defendant did so consent; most of that offered the court expressly ruled out as incompetent; and, as the facts were found by the court and not by a jury, we must presume that the court considered only the competent evidence. And especially is this so when, as here, the finding is in accord with what it should have been if illegal evidence was not considered."

In Nash v. Nash, 38 Ala.App. 682, 94 So. 2d 217, the Court of Appeals stated:

"When a cause is tried before a court without a jury, the court is presumed to eliminate all improper evidence when it makes its judgment upon the entire evidence. Especially is this so when the finding is in accord with what it should have been if improper evidence was not considered."

█ The above statement we believe sound if it be amended to the extent that if the improper evidence be admitted over objection, then it must be presumed that such improper evidence was considered.

█ But where, as here, the court had no opportunity to rule on the questioned evidence, must it nevertheless accord to evidence, inadmissible if objected to, full weight merely because the evidence is in a mass of documentary evidence injected into evidence by means of an agreement not to object to the authenticity of the documentary evidence offered.

Conceding that the inadmissible evidence was before the court under the above circumstances, it is to be noted as to documentary evidence admissible under Sec. 415, supra, lack of personal knowledge of the entrant or maker may be shown to affect its weight. It is clear from the record that the makers of the entries pertaining to the circumstances surrounding Mr. Reid's fall in the shower were not present at the time. Their statements are hearsay, and no part of the diagnosis and treatment of Mr. Reid. While these entries tend to establish appellant's contention that Mr. Reid's fall was due to the heart disease with which he was afflicted, the tendency of appellee's evidence was to create an inference that his fall resulted from the slippery nature of the tub. We are unwilling to say that the conclusions reached by the trial court were palpably erroneous.

Opinion extended; application overruled.

LIVINGSTON, C. J., and SIMPSON and MERRILL, JJ., concur.