153 So. 458

## NEW YORK LIFE INS. CO. v. TORRANCE.
### 6 Div. 382.

Court of Appeals of Alabama.
May 16, 1933.

Rehearing Denied June 30, 1933.

Motion to Extend Opinion Denied Dec. 11, 1933.

Stokely, Scrivner, Dominick & Smith, of Birmingham, for appellant.

Lange, Simpson & Brantley and Jas. A. Simpson, all of Birmingham, for appellee.

SAMFORD, Judge.

So far as this appeal is concerned, the law of this case is written for this court in New

York Life Insurance Company v. Torrance, 224 Ala. 614, 141 So. 547, 550. Code 1923, § 7318. It therefore would be a work of supererogation for us in this opinion to attempt a review of the many and various opinions cited and quoted from in the very extended, and we may say able, briefs filed by counsel for both appellant and appellee. Sufficient to say we have read the briefs and enough of the cases cited to become convinced that the conclusions reached by our Supreme Court in this case, supra, are correct, and, if the decision had been ours in the first instance, our conclusions would have been the same.

It becomes our duty, therefore, to find the facts and apply those facts to the law as it has been written.

■ The suit seeks a recovery under the permanent disability clause of a certain life insurance policy issued by the defendant. In this policy it is provided that, in order for the disability benefit to attach, the insured must become totally disabled before the anniversary of the policy on which the insured's age at nearest birthday is sixty years. In the former appeal in this case, as above noted, there were three policies of like tenor and intent involved, but on a retrial of the case all but one was eliminated. Plaintiff became sixty years of age September 30, 1928, and the anniversary of the policy here involved was March 27, 1929.

In order for plaintiff to recover on the policy here sued on, he must have become wholly and permanently disabled within the meaning of the terms of the policy prior to the 27th day of March, 1929. As to this plaintiff claims, and there is little doubt, that he was afflicted with Parkinson's disease or paralysis agitans on and for many months prior to the date as fixed in the complaint; that this disease is progressive and incurable, and from its inception it increases in intensity, until the person so afflicted is rendered permanently and wholly disabled from performing any work, and finally, tottering with palsy, he comes to the end of life.

■ The fact that plaintiff did not have a thorough examination and diagnosis of himself until January, 1930, and that during the intervening period he continued in his efforts to carry on the work of his profession, was evidence tending to prove that his disability caused by the disease was partial and not total. But such evidence is not conclusive on this point.

The diagnosis on January 5, 1930, the general nature of the disease, the observation of men of science familiar with such things, the testimony of these men who observed the failure in precision and skill in surgical operation, the falling away of clients, the trembling hands, the tottering limbs, the hesitancy of action, all of which extended many months prior to the 27th of March, 1929, was all evidence tending to prove that plaintiff was permanently and wholly disabled within the meaning of the language of the policy as defined by the Supreme Court in New York Life Insurance Company v. Torrance, supra.

It is admitted now that this plaintiff is and has been both wholly and permanently disabled by reason of this paralysis or palsy since January 8, 1930, and there is little doubt from the evidence in this record that if on March 15, 1929, this plaintiff had closed his office, given up his income, recognized the futile struggle against the inevitable, there could have been no doubt of his right to a recovery.

When then did the total disability take place? This total disability meaning: "Inability to do substantially all of the material acts necessary to the prosecution of insured's business or occupation, in substantially his customary and usual manner." New York Life Insurance Company v. Torrance, supra; United States Cas. Co. v. Perryman, 203 Ala. 212, 82 So. 462. On this question, and being of necessity controlled by the facts as set out in that record, the opinion in this case on former appeal has this to say: "We do not find any evidence justifying the conclusion that during the period here in question the insured suffered any impairment as to his skill as a physician and surgeon. At the most, his work was made somewhat more difficult, and his movements some slower, but the record is persuasive he did his work ably and well. The fact that he was somewhat handicapped could at best be termed only a partial disability." The foregoing quotation from the opinion of Mr. Justice Gardner was doubtless warranted by the evidence on that appeal, but this court would not be justified in such a conclusion by the facts here presented. In this record appears the testimony of witness after witness, men of high professional ability and experience, close professional associates of the plaintiff for years, all of whom at one time or another had recognized plaintiff as a surgeon of outstanding ability and skill and yielded to him the patients under their care for surgical operation, with confidence that they were obtaining for such patients the best

there was in surgery. After years of such professional association and observation, one by one they fell away and ceased to trust him to operate. Each of them noted his mental and physical inability to operate with dexterity and accuracy. These witnesses testified to these facts covering a period reaching back into 1926. As a fair illustration of this evidence is the following from the testimony of Dr. Levy:

"I have been practicing in Birmingham about 27 years and have known Dr. Torrance about 22 years. Beginning in 1920 I sent my surgical cases to Dr. Torrance, some 15 major cases a year. The last one I sent him was on the 8th of June, 1928.

"On June 8th, 1928, I called him to do a blood transfusion that would take the ordinary surgeon about 20 minutes. I have looked up the hospital chart and find that the record shows that it took Dr. Torrance from 3:45 to 6 P. M. 'In trying to stick the needle he would miss the veins * * * and he would cut the tissue over the veins, which is very seldom done.' That was not a proper and skillful way to do that operation. 'I do not think he was capable of doing any surgery at that time or after that time.' 'I did not refer any more cases to him.'

"I noticed that his mental condition was not very good. His memory was bad. He would confuse facts about cases we had had. I think he should have given up his work entirely.

"The donor of the blood in this transfusion was all right for an hour or so but we had to give him some stimulants on account of the fact that it took so long."

From Dr. Lewis:

"In 1927 his physical condition was such that * * * he was so slow he was unable to do acts with the rapidity necessary to do surgical work. I did not consider that he did the work that he tried to do in such way that he could be called capable of doing surgery at all. * * * In 1927 had paralysis agitans, or a disease that affects the muscles and mental processes."

Dr. Foster testified that on January 3, 1929, Dr. Torrance was incapable of performing surgery. Dr. Sellers confirms the testimony of Dr. Foster.

Dr. Mitchell places the disability in April, 1928, and says that at that time plaintiff was: "Down and out; he was shaky in his cutting; he was inaccurate. I considered

then that he wasn't able to do any more operating."

Dr. Daly places the time of inefficiency in 1927 and 1928, and gives it as his opinion that he was not capable of doing surgical work.

From Dr. McKinnon:

"I have known Dr. Torrance since the latter part of 1910. I have been practicing in Birmingham and have been sending Dr. Torrance my surgical cases since 1912 or 1914 up until 1926, to be exact the last case I sent him was on July 21, 1926, a Mrs. Newton. Prior to that time I considered Dr. Torrance the best surgeon we had in the South.

"I observed the operation on July 21, 1926, and at that time I noticed that there was a lack of dexterity on his part. He was slow and did not seem to be able to tie the ligaments or the suture material accurately. He would make efforts to pick up one instrument and pick up another. In other words there was a lack of coordination of the muscular movements. That has grown worse since then. That operation was not satisfactory to the patient or to me. That operation should have removed the trouble the woman was suffering from but it did not.

"I had Dr. Torrance wait on me when I had a broken leg in 1925 or 1926. His movements were painfully slow at that time. It seemed to me that it took three-quarters of an hour from the time he stopped his car in front of the hospital to walk to my room and he was within the range of my observation all of this time except for 50 to 75 feet which he covered as rapidly proportionately as the other. As to his mental condition at that time, it was practically the same as his muscular movements; very slow.

"In 1928 or 1929 I observed Dr. Torrance in the office of Stokely, Scrivner, Dominick & Smith who were defending him in a malpractice case. We had to move from one office to another and for him to get out of his chair, pick up his hat and papers off the table and get to the other room it took from 10 to 15 minutes."

From Dr. Deaver: "He was not qualified to do surgical or medical work of any kind" from 1927 or 1928.

From Dr. Carroway:

"I am chairman of the Board of the Norwood Hospital and have been practicing medicine since 1900. Dr. Torrance has been operating there since 1917.

"In 1928 I noticed that his hands and feet and his whole body trembled; he was unable to walk in 1928. His condition was that 'he could not walk or manipulate his hands without difficulty and he had no control over them much; they would tremble and his feet —and he would walk very carefully and have to place each foot and watch where he stepped, and in trying to manipulate his hands in operating, why he would have to make attempt after attempt to do things you ought to with one stroke of your hands, and he was not certain about what he was going to do when he went to do it.' 'Dr. Torrance could not stand up and pull off his trousers in preparing for an operation; he would topple over and fall if he attempted to pull off his trousers; he would get unbalanced and would fall.' 'I saw the condition known as Parkinson's disease on Dr. Torrance during the entire time from 1928, up to the present.' 'Dr. Argo assisted Dr. Torrance in practically all of his major operations in the Norwood Hospital during the years 1928 and 1929. Dr. Argo was not his assistant in the sense of being a hired man by him.'

"In my judgment Dr. Torrance was not qualified to do surgery during the years 1928 and 1929; he was not qualified to *do any surgery of any kind*. 'Dr. Torrance did not do any surgery in the Norwood Clinic or Hospital during the years 1928 and 1929 without some one competent there to assist him as far as I know.'

"During the last two years when those patients were coming there under the Gulf States Steel and Republic Steel *contracts* I actually did most of this work for the last year, that is, 1929. Those patients would come there as Dr. Torrance's patients. They were admitted as Dr. Torrance's patients. 'I did the work.' 'After he had quit entirely I never did see him but the work was in his name, I just did it for him. That was after he had closed his office and did not come to the hospital at all. The proceeds of that contract went to Dr. Torrance.' · *'I did most of his work for about a year before he closed his office.'* "

On cross-examination this witness further said:

"As I stated this morning, I assisted Dr. Torrance in a lot of his work. I did most of the work where Dr. Torrance was surgeon in the case. That is as near as I can give you. 'In those cases I assisted in I did practically most of the work.'

"If I have got the data correct after January 8, 1930, there was a lull in there, and then he paid me $100.00 a month for a certain time to do some work. If those dates are correct he stopped paying me to look after his work about the latter part of 1930. Two people I operated on for the Gulf States Steel people that Dr. Torrance did not have anything to do with that would come under his service but so far as he knew about it, he did not have anything to do with it. Those were patients that were supposed to be his patients that he did not know about.'

"The consequence was, this difficult work up there I did most of the work for him. That was in 1929.

"In the condition I saw Dr. Torrance in in 1928, in my opinion he was not able to do the operations and he should not have attempted it. The treatment that Dr. Torrance should have had prescribed for him when that condition developed was rest; quit work. I have never known anybody to get well of paralysis agitans."

And so on through the testimony of Dr. Swedlaw, Dr. Nice, Dr. Argo, Dr. Bobo, Dr. Vance, Dr. Johnson. While Dr. Russell testified that in January, 1929, he did not consider Dr. Torrance totally disabled and unable to perform any of his duties as a physician, it must be remembered that Dr. Russell is associate medical director of one of the largest life insurance companies in New York, with office in New York, not in close association with Dr. Torrance, and yet his interview with plaintiff in January, 1929, resulted in the relieving of Dr. Torrance from the principal work of medical reference and complete relief of this work in September, 1929. The testimony of all these other doctors stand upon a different plane. They were all closely associated with plaintiff in the actual practice of his profession and the execution of his work; they are in a better position to know than anybody on earth; their testimony is straightforward, both as to professional opinion and to the details of the evidences of inability in particular cases. Such testimony is not to be ignored.

If, then, the rule is as stated in the foregoing opinion as copied from the opinion in this case on former appeal, then we think this case should be governed by the rule laid down in Travelers' Insurance Company v. Plaster, 210 Ala. 607, 98 So. 909; United States Casualty Company v. Perryman, 203 Ala. 212, 82 So. 462.

■ We recognize the rule that, where the evidence is without conflict and contrary inference cannot reasonably be drawn therefrom, the affirmative charge is properly

given. Ellis v. New York Life Insurance Company, 214 Ala. 166, 106 So. 689.

■ But, where there are facts from which a jury may legally infer that the allegations of the complaint are true, the question is for the jury, and the court is not justified in holding otherwise. Authorities supra.

■■ The question at issue here is not whether the plaintiff was wholly and totally disabled from performing work as a surgeon. It is now conceded that he is. The question is, When did he become so? The witnesses for plaintiff say that such disability occurred on and prior to March 15, 1929. The evidence for defendant tends to prove that plaintiff performed much of his professional work for which he received large and constant remuneration after March 27, 1929.

On the trial in the court below the defendant introduced, in its entirety, the evidence introduced by it on the former trial of this case, as disclosed by the record presented to the Supreme Court in connection with the former appeal of this case, which evidence for defendant is summarized in the opinion written by the Supreme Court on the former appeal of this case, as reported in 224 Ala. 614, 141 So. 547.

Plaintiff's evidence tends to prove that such work as he did was done under great mental and physical strain, and that so inefficiently as to cause his practice to fall away, because such work could not be performed in substantially his customary and usual manner. The indemnity promised in the policy is not an insurance of income, but is an insurance that insured will be able to continue the work incident to his profession in substantially his customary and usual manner. Metropolitan Life Insurance Company v. Bovello, 56 App. D. C. 275, 12 F.(2d) 810, 51 A. L. R. 1040; 1 Corpus Juris, 463. Was the disability after March 15, 1929, wholly or partial, within the meaning of the policy as defined by our Supreme Court? There is evidence pro and con on both these propositions, and, when this is so, the jury and not the court must speak, and their conclusions are final, unless their findings are against the overwhelming weight of the evidence. Is that so in this case? We do not think it is.

The evidence for plaintiff also tends to prove that at the time of the issuance of the policy the plaintiff's principal occupation was that of a surgeon, and that, while he did some other work pertaining to the medical profession, such work was incidental to his surgery. However that may be, the evidence for plaintiff tends to prove that by reason of this disease his mental condition was also affected to such an extent that his judgment was not accurate and was frequently at fault. This, too, was a question for the jury.

It is urged by appellant that opinion evidence, however weighty it may be, is without probative value when opposed to uncontradicted facts introduced in evidence, and that a physician's statement that insured, a physician and surgeon, was not competent or able to perform operations after a given date, is without probative value, when uncontradicted facts in evidence showed that insured continued customary work after such date. There is a shade of difference between the above statement and what the law really is, as declared in this case on former appeal. The evidence for plaintiff tends to show that, while plaintiff continued his customary work for some months after March 27, 1929, such work was not performed "in *substantially his customary and usual manner*." · (Italics ours.)

■ There are a vast number of objections and exceptions relating to the testimony of the many physicians who testified in this case, all of whom qualified as experts in their profession and the most of them eminent to a marked degree. All of these witnesses testified from a close personal and professional contact with the plaintiff, covering a period of many years. They described in detail the character of the work performed by plaintiff before and after he became affected by the disease, which finally rendered him helpless. Without having made a formal physical examination of plaintiff, they observed the symptoms, and from these symptoms and their knowledge of the science of medicine and the human system they were permitted to testify as experts as to the physical condition of plaintiff at certain times during which he was under their observation; they were permitted to express opinion as to whether such operations as they described were performed in a skillful and surgeon like manner; also as to whether at the time plaintiff was capable of performing operations on human beings. While some of the answers of these experts came in the form of statements of facts, the whole examination clearly shows them to be nothing more than the opinion of the witnesses, which they were qualified to express. Thaggard v. Vafes, 218 Ala. 609, 119 So. 647.

■ "In the field of medical knowledge, a wide range is necessarily allowed in recep-

tion of the inferences of observers and the judgments of experts." One of the many subjects upon which a medical expert is allowed to testify as to his opinion is as to the physical condition of a person coming under his observation. Western Union Telegraph Company v. Rowell, 153 Ala. 295, 45 So. 73; Thaggard v. Vafes, supra; also as to what certain observations indicate. Rohn v. State, 186 Ala. 5, 65 So. 42. When the opinions in Birmingham Railway & Electric Company v. Ellard, 135 Ala. 433, 33 So. 276, Louisville & N. R. Co. v. Elliott, 166 Ala. 419, 52 So. 28, and De Phue v. State, 44 Ala. 32, are properly understood, they also sustain the above proposition.

If there were some technical errors in some of the many rulings of the court in the admission of this expert testimony, we are quite sure they were not such as to prejudice defendant's case.

Upon the whole record, we observe that the cause was ably tried and fairly presented to the jury, and the meritorious questions in controversy are squarely presented here.

We find no reversible error in the record, and the judgment is affirmed.

Affirmed.