191 So.2d 20

**FIDELITY SERVICE INS. CO. et al.**

v.

**James M. JONES.**

**6 Div. 122.**

Supreme Court of Alabama.

Sept. 15, 1966.

S. P. Keith, Jr., Birmingham, for appellants.

196

Bevill & Jackson, Jasper, for appellee.

COLEMAN, Justice.

Defendants appeal from a judgment for plaintiff in an action on a policy of accident insurance on the life of plaintiff's son, Kenny Jones.

By the policy, defendants agreed as follows:

".... the Company hereby insures the person named in said schedule against loss of life through accidental means and against loss of sight and limb from injury, subject to all the provisions and limitations hereinafter set out.

"........ If the insured sustains drowning or bodily injury effected solely through violent, external and accidental means, and if such drowning or bodily injury is the direct, independent and proximate cause of the death of the insured within 90 days from the date of such injury, and if such death is not caused or contributed to by disease or infirmity, the Company will on surrender of the policy pay the principal sum specified herein; ...."

The evidence tends to show the following facts. Insured spent the night at his father's home. The next morning, insured ate breakfast and walked about a mile to get help to start his truck which he used to haul coal. After work, around 6:00 p. m. that day, insured drove his truck to the home of his father-in-law and parked the truck which was loaded with five or six tons of coal. Insured had coal dust on his clothes. He came into the house. He did not complain of being sick and appeared to be normal. He drank a coca-cola with his father-in-law. Insured went outside and moved his own truck and the father-in-law's truck. Insured came back into the house and they talked "Maybe fifteen or twenty minutes." Insured went into the bathroom to clean up. The bathroom had a hard surface, linoleum floor. A small, cloth throw rug, 18 by 30 or 36 inches, was on the floor. Insured closed the bathroom door. The father-in-law heard a noise which sounded "like he knocked something off a shelf" and went to the bathroom door. He heard "him splashing water" and went back and sat down approximately "four minutes, maybe."

After the interval, the father-in-law jerked the bathroom door open. It, apparently, had been latched with a hook and eye latch. He found insured "slumped over in the

tub, with his head under water." The water was eight or ten inches deep. Insured's mouth and nose were under the water. He had on his undershirt and shorts. The "little throw rug was 'sorter around his feet." The floor was wet and appeared to be slick. The father-in-law found a straight razor under the bath tub. He pulled insured out of the tub. Insured was dead.

The father-in-law saw no bruises or blood on insured's head. The water in the tub appeared to be dirty and it appeared to the father-in-law that insured had bathed. His body appeared to be clean. No autopsy was performed.

Defendants introduced a certified copy of a death certificate which recites in part as follows:

"Part 1. Death was Caused By:
   "Immediate Cause (a) Accidental Drowning
   " ................................

   "DESIGNATE BELOW HOW
    · INJURY OCCURRED:

"This person was preparing to take a bath, Apparently .had a blackout which he was subject to and fell over into tub Breaking his nose and drowning."

The certificate shows insured's age as thirty-five years.

A physician testified that he knew insured and had treated him for the first time on August 29, 1959. On the first visit, insured told the doctor that insured had had a nervous breakdown. The doctor prescribed a tranquilizer. Insured also had a few pus cells in his urine and for this the doctor gave a sulfa drug. The following week, the doctor gave insured "Stalazine, for nervousness." That was the extent of the treatment. The doctor checked for pus in insured's kidneys on the second visit and he had no pus. No other prescription was given.

Insured's third visit to the doctor was about two and one-half years later. Insured complained of hurting all over and of nervousness and headaches. He made no complaint of dizziness. The doctor gave an injection of penicillin and a prescription for Signemycin. No other treatment was given.

The doctor saw insured for the fourth time about two months later. He complained of "being nauseated, also having cold sweats and tochycardia," which "is a rapid pulse." It might be tied in with dizziness. Insured was given "Milpath, and Riopan," which might be used in treatment of ulcers or in the treatment of a nervous stomach. The doctor did not make a diagnosis of insured's case; his physical examination was negative. He did complain of dizziness at that time.

The fifth and last visit to the doctor's office was about ten months later, on February 15, 1963. This was three weeks prior to insured's death on March 8, 1963. On this last visit, insured complained that he had "blacked out at work that morning" and of a headache and of his jaws and arms being sore. The doctor prescribed "librium, and Butigetic, that is an aspirin-like drug."

On cross-examination, the doctor testified that on the fourth visit, almost eleven months before insured's death, one reason he made no diagnosis was because his physical examination showed nothing wrong with insured; that dizziness and nausea can be caused by a number of things; that a cold can make a man dizzy, if the inner ear is affected, and could cause nausea and sweats; and that insured had never given any history of blackout on or before the fourth visit. The doctor further testified that on the fifth visit, insured had said he had "blacked out" at work, but the doctor did not know whether insured meant that he was unconscious or whether he got sick and sat down; that he did a complete physical on insured at that time and did not find anything wrong with him; that insured complained that one time about "blackouts";

that the doctor did not know what caused insured to fall, if he fell at the time of his death; that the only disease the doctor ever found insured suffering from was nervousness; that on the fifth visit the doctor recommended that insured go to the hospital for examination and observation to try to find out "why he became dizzy, why he fainted"; that the only thing the doctor ever found wrong with insured was a nervous condition and a kidney condition; and that was over a period of four or four and a half years.

### 1.

Defendants argue four grounds for reversal. First, defendants say the court erred in refusing to give the affirmative charges, with hypothesis which defendants requested in writing.

Defendants say that "The lower court properly admitted the death certificate as evidence of the facts therein stated, . . . . and it is our contention that this evidence constituted all of the evidence relating to the cause of the death of the insured"; that the explanation on the certificate shows that insured's death was not an accident but was "caused from a physical illness or condition which was stated as being a 'blackout' "; and, therefore, that plaintiff failed to show that he is entitled to recover because the policy does not provide insurance when the death of insured "resulted directly or indirectly from disease or bodily infirmity provided such disease or bodily infirmity was an efficient cause of death."

We do not agree with defendants. In civil cases, the question must go to the jury if the evidence or the reasonable inferences arising therefrom furnish a mere gleam, glimmer, spark, the least particle, the smallest trace, a scintilla, in support of the theory of the opposing party. Alabama Great Southern R. Co. v. Bishop, 265 Ala. 118, 123, 89 So.2d 738, 64 A.L.R.2d 1190.

Where the evidence is without conflict and contrary inference cannot reasonably be drawn therefrom, the affirmative charge is properly given, but, where there are facts from which a jury may legally infer that the allegations of the complaint are true, the question is for the jury and the court is not justified in holding otherwise. New York Life Ins. Co. v. Torrance, 26 Ala.App. 38, 42, 43, 153 So. 458; certiorari denied in New York Life Ins. Co. v. Torrance, 228 Ala. 286, 287, 153 So. 463, where this court said:

"The contention is made that the Court of Appeals erroneously asserted that an issue should be determined by the jury, though there is no conflict in the evidence, if the jury may infer from the evidence that the complaint is true. The statement in the opinion of the Court of Appeals has been recognized as being correct by the uniform decisions of this court so far as we have had the matter called to our attention. The general charge should not be given 'when the evidence is conflicting, or when the evidence is circumstantial, or when a material fact rests wholly in inference.' Smoot v. Mobile & M. Ry. Co., 67 Ala. 13; Ala. Gold Life Ins. Co. v. Mobile Mutual Ins. Co., 81 Ala. 329, 1 So. 561; Tabler v. Sheffield, etc., Co., 87 Ala. 305, 309, 6 So. 196; Tobler v. Pioneer M. & M. Co., 166 Ala. 482, 518, 52 So. 86; John v. Birmingham Realty Co., 172 Ala. 603, 55 So. 801; Alaga Coach Line v. McCarroll, (Ala.Sup.) [227 Ala. 686] 151 So. 834, 92 A.L.R. 470."

The evidence pertaining to the cause of insured's death is circumstantial and any determination of that cause must rest in inference drawn by the trier of fact from all the circumstances.

The evidence seems to us to compel the inference that insured fell and his head struck the tub, breaking his nose; that he was unconscious either before or after his head struck the tub; and that, because he was unconscious, his head remained under the water and he drowned.

The evidence supports at least two theories as to the cause of the fall. The evi-

dence is that the bathroom floor was covered with hard surface linoleum and a small rug, was wet, and appeared to be slick. The common experience of mankind on wet, slick bathroom floors supports the inference that insured may have slipped and fallen, striking his head on the tub, thereby becoming unconscious and drowning. If such was the case, then his drowning was not caused or contributed to by any disease or infirmity and plaintiff was clearly entitled to recover. This explanation of the death is consistent with the absence of disease or infirmity as a contributing cause of the accident and brings the case within the terms of the policy.

The other theory is that .insured suffered a blackout, became unconscious, and fell onto the tub with his head into the water. In such a case, he may have been unconscious before the fall, and it may fairly be said that the fall was caused or contributed to by the blackout. Assuming that the proper construction of the policy prevents plaintiff from recovering if the fall was caused or contributed to by a disease or infirmity, then we must decide whether or not a blackout or fainting spell is a disease or infirmity within the meaning of the policy.

In discussing defendants' second ground argued for reversal, we consider the reasons why we hold that the jury could find from the evidence that, even if a "blackout" caused insured to fall, the "blackout" was not a disease or infirmity within the meaning of those words in the policy.

Because the jury could find for the plaintiff under either one of the two theories, the affirmative charges requested by defendants were refused without error.

## 2.

Defendants say the court erred in refusing to give defendants' requested charge four which recites:

"I charge you if you believe from the evidence that Kenny Jones had a 'blackout' which contributed to a fall on March 8, 1963, which caused his death, you must find in favor of defendant."

Charge four is based on the assumption that the "blackout" which plaintiff suffered was a disease or infirmity" within the meaning of those words in the policy. The effect of giving charge four would be to say to the jury that if insured had a blackout which contributed to his fall, such a blackout would be a disease or infirmity referred to in the policy as a matter of law, and, therefore, that the jury could not find to the contrary. We must decide then, whether such a "blackout" is a disease or infirmity within the meaning of the policy.

In Webster's Third New International. Dictionary, unabridged, 1961, at page 227,· blackout is defined as:

"2 a: transient dulling or loss of vision or consciousness resulting from temporary impairment of cerebral circulation b: a lapse of memory c: a loss of consciousness."

Other courts have considered the meaning of the words "disease or infirmity" in accident insurance policies.

In Manufacturers' Accident Indemnity Co. v. Dorgan, 6 Cir., 58 F. 945, 22 L.R.A. 620, the court considered an accident policy which provided that benefits thereunder ". . . . ' . . . . shall not . . . extend to or cover accidental injuries or death resulting from or caused, directly or indirectly, wholly or in part, by or in consequence of fits, vertigo, somnambulism, or any disease existing prior or subsequent to the date of this certificate. . . . .' "

The death of insured occurred while he was fishing in a trout stream. He and others of the party fished from 3:00 ·or 4:00 a. m. until lunch. Insured spoke of having some difficulty with his throat and chest before going on the trip. He took something for breakfast. He came in to lunch but the evidence did not show how much he ate, if anything. After lunch, he went back to an island where, shortly afterwards, he was seen playing a trout. Twenty

minutes later he was found dead, lying with his face downward in six inches of water. The bank was about eighteen inches above the water, in which were stones, egg-size and smaller, on which he might have struck his head. Two bruises were on his forehead. Some yellowish froth was about his mouth; his face was purple; his tongue was somewhat inflamed. An autopsy next day disclosed that his blood was rather fluid and had not coagulated; the brain, heart, and other vital organs were in a normal, healthy condition.

Defendant introduced evidence to show that insured had suffered from defective heart action in its aortic valve. The autopsy failed to reveal any structural defect but all tests were not applied. The evidence as to defective heart action was given by a physician who had examined insured during his life. The physician testified to a murmur accompanying the beat of the heart, which was said to reveal such structural defect, although he admitted such murmur is sometimes present when the heart action is normal but the beat and circulation are feeble. Some evidence showed that insured had suffered from dizziness caused by this defective action of the heart.

In affirming the judgment for the plaintiff, the court said:

"The twelfth assignment of error was based on the refusal of the court to instruct the jury that on the undisputed evidence in the case the plaintiff was not entitled to recover. We are very clear that this request was rightly refused.

"The defendant made two issues. . .
. .

"The second issue was as to whether the manner and cause of the death brought it within the policy. The burden of proof on this issue was upon the plaintiff. The deceased was found in the water, with his face in such a position that death might have come from suffocation by drowning, if he had been rendered unconscious before or after striking the water. There were bruises upon the forehead of the deceased, indicating that his head had struck something hard, and the bruises were of a character sufficient, as testified to by an expert witness, to have produced unconsciousness. The circumstances surrounding the death, therefore, were consistent with the theory that the deceased had slipped and fallen in such a way as to strike upon his head against a hard substance, producing unconsciousness, in which helpless state suffocation by drowning followed. This was one explanation of the death consistent with the absence of disease as a moving or contributing cause to the accident, and certainly brought the case within the terms of the policy. Then there was another possible view which the jury in fact took, and which will be discussed hereafter. Whether one or the other theory, or still another, satisfied the circumstances of the case, it was for the jury to decide. The court had no right to usurp the functions of the jury in this respect.

". . . . . . .

"We now proceed to inquire whether, if the fall of the deceased into the water was caused by fits, vertigo, or any disease, such accidental death could be said, within the meaning of the policy, to have been 'caused directly or indirectly, wholly or in part, by or in consequence of such fits, vertigo, or disease.' In our opinion the adjective 'accidental' qualifies not only 'injuries,' but also 'death,' and therefore an accidental death by drowning does result from, and is caused indirectly by, fits, vertigo, or other disease, if the fall into the water, from which drowning ensues, is caused by such disease.
. . . .

"We are therefore finally brought to the question what the words 'disease and bodily infirmity' include. . . . . In a broad, generic sense, any temporary trouble by reason of which a man loses consciousness is a disease. It is a con-

dition of the body not normal, and produced by the imperfect working of some function, but as the imperfect working is not permanent, and the body returns at once, or in a short period of time, to its normal condition, it does not rise to the dignity of a disease. A fainting spell produced by indigestion or a lack of proper food for a number of hours, or from any other cause which would not indicate any disease in the body, but would show a mere temporary disturbance or enfeeblement, would not come within the meaning of the words 'disease and bodily infirmity,' as used in this policy.

"It is a well-settled rule in the construction of insurance policies of this character, which the insured accepts for the purpose of covering all accidents, to construe all language used to limit the liability of the company, strongly against the company. Policies are drawn by the legal advisers of the company, who study with care the decisions of the courts, and, with those in mind, attempt to limit as narrowly as possible the scope of the insurance. It is only a fair rule, therefore, which courts have adopted, to resolve any doubt or ambiguity in favor of the insured and against the insurer. . . . ." (58 F. at pages 950, 951, and 955, 22 L.R.A. at pages 623, 624, and 626)

Thus the court held in *Dorgan* that the jury could find that the death of insured was not caused, directly or indirectly, wholly or in part, by disease or bodily infirmity, even though his fall into the water, from which drowning ensued, may have been caused by a fainting spell. The reason for this holding is that the fainting spell did not, as a matter of law, constitute a disease or bodily infirmity as those terms were used in the policy. The concluding paragraph of the opinion recites:

"The point made under the twenty-fifth assignment of error is that there was no evidence to sustain the finding of the jury that the unconsciousness of the deceased, during which drowning ensued, was caused by a temporary affliction. There certainly was no direct evidence of this cause. No one was present to see how the death in fact did occur. The conclusion of the jury in any case must be based upon inference from circumstances, and not from direct evidence. There was the circumstance that the deceased was found dead, with his face submerged in water, in such a position that drowning might have caused his death. There was the expert evidence of the physician who performed the autopsy to the effect that the condition of the body of the deceased after death indicated death by drowning, and was what might be expected if the deceased had been drowned. There was the evidence of the same physician that the vital organs of the deceased were normal, and indicated the presence of no disease. Assuming these facts proven (and, there having been evidence to prove them, the jury had a right to conclude that they were facts,) it would be a very reasonable inference that a man would not drown in water only six and a half inches deep unless he were unconscious as he lay in the water. Something must have produced the unconsciousness. It was not produced by disease, because the autopsy tended to show that the deceased was not suffering from disease likely to cause unconsciousness, and the jury might well have inferred that the bruises upon the head did not indicate a sufficient concussion to produce unconsciousness. Reasoning by exclusion, therefore, the jury might from the circumstances properly have found the verdict which they did find, namely, that the unconscious and helpless condition of the insured in which drowning ensued arose, not from disease, but from indigestion or want of food, or some other temporary cause." (58 F. at page 956, 22 L.R.A. at page 627)

So in the instant case, the evidence showed that the jury may have found that

the unconsciousness of insured, during which drowning ensued, was caused by a temporary affliction. There is no evidence here that anything which would constitute a disease was wrong with insured. The physician testified that he "did a complete physical" on insured on February 15, 1963, and his finding was negative.

Other authorities support the construction of disease or bodily infirmity which was applied in Dorgan. In Meyer v. Fidelity and Casualty Co., 96 Iowa 378, 65 N.W. 328, plaintiff sued on an accident policy to recover for death of insured. The policy provided that the insurance should not cover "'injuries, fatal or otherwise, * * resulting directly or indirectly from . . . . vertigo, sleepwalking, fits, hernia, or any disease or bodily infirmity.'" Insured, who apparently had been in good health previously, for some unexplained reason, staggered and fell on a sidewalk and his head struck the pavement. The fall resulted in skull fracture and he died in a few hours. On appeal, the Supreme Court of Iowa affirmed the judgment for plaintiff, and approved the instructions given to the jury by the trial court as follows:

"'(6) If Herman H. Meyer's fall was caused by disease, plaintiff cannot recover; but the question naturally arises, what is a "disease" within the meaning of the contract in suit? The ordinary definition of the word is: "Any derangement of the functions or alteration of the structure of the animal organs." This, as you will see, would include the slightest and most temporary ailment. But this is not its meaning as used in this policy. The policy or contract in suit singles out some particular diseases, as vertigo or fits, and exempts the company from liability for accidents caused thereby; and in such cases, as I have told you in the last instruction, the company will be relieved from liability, even if the attack was sudden, unusual, and of a transient nature; but if you don't find either of these two specially mentioned maladies to have been the cause of such accident, but are required to see whether such cause existed under the general head of "disease," then you must accept this word as meaning some ailment or disorder of somewhat established or settled character, some physical disturbance to which Meyer was subject, and of which the attack that caused his fall was in some measure a recurrence. A mere temporary disorder, that was new or unusual with him, arising from some sudden and unexpected derangement of the system, though it produced or caused unconsciousness, would not be a "disease," within the meaning of this contract, and would not exempt the defendant company from liability in this action. Here, again, you are limited to circumstantial evidence upon which you are to base your finding.' In another instruction the court said: 'Construing the contract or policies sued upon, I may say that under its provisions, if said Meyer's fall was caused by vertigo or fits, or by reason of disease or bodily infirmity, the defendant cannoot be held liable in this action. And, under the facts in this case, the words "disease" and "bodily infirmity" must be considered as having the same meaning.'" (96 Iowa at pages 383 and 384, 65 N.W. at page 329.)

The appellate court said further:

"It is also said in argument that the policy covers death from violent, external, and accidental means, and that the proximate cause of death in this case was not the fall, but some disorder with which the deceased was afflicted. It is quite clear, both on principle and authority, that, if the disorder which caused the fall was temporary and unexpected, the injury was violent, external, and accidental, and the whole matter was properly left to the jury for them to determine whether the disorder was of a temporary character." (96 Iowa at page 387, 65 N.W. at page 330.)

In The Interstate Casualty Co. v. Bird, 18 Ohio Cir.Ct.R. 488, 10 Ohio Civ.Dec. 211,

the insurer contended that the evidence proved that deceased died from an attack of vertigo and that this was established by testimony that insured complained of feeling faint just before the accident as well as by the position of the body immediately after the fall. Physicians testified, however, that insured's condition might have been due to other causes. The appellate court said that "Admitting these contentions as to the state of the proof," they do not raise the necessary inference that the fall resulted from vertigo or any disease which was excepted in the policy and " 'that injuries caused by a fall due to a temporary and unexpected physical disorder are violent, external and accidental within the meaning of such words in an insurance policy.' "

In Fairclough v. Fidelity & Casualty Company, 54 App.D.C. 286, 297 F. 681, the trial court directed a verdict for defendant in an action on a policy whereby defendant promised to pay for injury " 'effected, directly and independently of all other causes, through external, violent, and purely accidental means.' " Insured, a dental student, was sitting on a patient's bed observing the patient's recovery from an anaesthetic. Insured arose to leave the room and fell, striking his head upon the floor and fracturing his skull from which he died about a week later. Some days after the fall, insured said that he had become dizzy while sitting on the bed and had started out of the room when he fell. Defendant contended that plaintiff had not met the burden of proving that the injury was effected directly and independently of all other causes through external, violent, and purely accidental means, because the insured had suffered an attack of vertigo which caused him to fall. The trial court accepted defendant's view. The appellate court, however, held this was erroneous and said:

" . . . . Under the evidence the jury would have been entitled to find

that the attack of vertigo, if one actually took place, was unexpected, unusual, and no more than a merely temporary disorder; that it had no direct effect upon the health or life of the insured; and that, even if it caused the insured's fall, the fall, and not the vertigo, was the sole proximate cause of the injury. And if the jury had found such to be the facts, it would follow that the alleged vertigo would not have barred a recovery upon the policy. The issue, therefore, should have been submitted to the jury." (54 App.D.C. at page 288, 297 F. at page 683)

We note that the policy in *Fairclough* apparently did not contain a special clause excluding coverage for death "caused or contributed to by disease or infirmity," as does the policy in the instant case. See First National Bank v. Equitable Life Assur. Soc., 225 Ala. 586, 144 So. 451, for our rule as to policies with and without such a special clause. Fairclough appears to be in that class of cases wherein the general clause is treated as excluding liability where disease or bodily infirmity is an efficient cause of death.

While the case is not directly in point, the court in Robinson v. Aetna Life Ins. Co., (Tex.Com.App.), 276 S.W. 900, said:

" . . . . However, it is true that a 'fainting spell' or other temporary 'bodily infirmity' may be the 'accidental means' of an injury within the meaning of accident insurance. . . . . " (276 S.W. at pages 902 and 903)

In Silverstein v. Metropolitan Life Ins. Co., 254 N.Y. 81, 171 N.E. 914 (quoted from with approval in First National Bank v. Equitable Life Assur. Soc., supra), the policy did not cover death "caused wholly or partly by disease or bodily or mental infirmity." The appellate court affirmed a judgment for plaintiff where insured suffered a fall which perforated a dormant ulcer, causing peritonitis and later, death. In holding that the ulcer was not, as a

matter of law, a disease or infirmity within the meaning of the policy, the court said:

> ". . . . In a strict or literal sense, any departure from an ideal or perfect norm of health is a disease or an infirmity. Something more, however, must be shown to exclude the effects of accident from the coverage of a policy. The disease or the infirmity must be so considerable or significant that it would be characterized as disease or infirmity in the common speech of men (Citation Omitted.). 'Our guide is the reasonable expectation and purpose of the ordinary business man when making an ordinary business contract' : (Citations Omitted.). A policy of insurance is not accepted with the thought that its coverage is to be restricted to an Apollo or a Hercules.
>
> "A distinction, then, is to be drawn between a morbid or abnormal condition of such quality or degree that in its natural and probable development it may be expected to be a source of mischief, in which event it may fairly be described as a disease or an infirmity, and a condition abnormal or unsound when tested by a standard of perfection, yet so remote in its potential mischief that common speech would call it not disease or infirmity, but at most a predisposing tendency (Citations Omitted.). . . . ." (254 N.Y. at page 84, 171 N.E. at page 915)

In the instant case, the jury was not, as a matter of law, bound to find that the "blackout" was a disease or infirmity within the meaning of those words in the policy. The jury were free to conclude that the "blackout" was not such a disease or infirmity but was a temporary disorder which did not have that established or settled character commonly attributed to a physical derangement which is called a disease or infirmity in the ordinary understanding of men. Giving defendants' charge four would have instructed the jury to the contrary and the charge was refused without error.

3.

■ Defendants argue that the court erred in overruling those grounds of the motion for new trial which raise the point that the "judgment" is not sustained by the great preponderance of the evidence.

Disregarding the use of "judgment" instead of "verdict" in the motion for new trial, we are of opinion that the evidence sufficiently supports the verdict and that the motion was overruled without error.

4.

Defendants argue that the court erred in overruling defendants' objections to three questions propounded to plaintiff's witnesses as follows:

> "Q. Did he complain of any sickness or anything like that?
>
> " . . . . . . . . .
>
> "Q. Had your son complained any during that time as to being sick or not feeling well?
>
> " . . . . . . . . . .
>
> "Q. Did you know of him complaining about any blackout at any time?"

The inquiries were whether insured had made the complaints referred to. Defendants say the evidence called for by the questions was not admissible because it was hearsay.

■ The general rule is that, whenever the bodily or mental feelings of an individual are material to be proved, the usual expression of such feelings, made at the time in question, are original evidence. So, also, the representations by a sick person, of the nature, symptoms, and effect of the malady under which he is laboring at the time, are received as original evidence, whether made to a medical attendant or any other person, though not, in the latter case of so much weight. Rowland v. Walker, 18

Ala. 749, 750. See also: Eckles v. Brown and Bates, 26 Ala. 655; Southern Ry. Co. v. Hardin, 1 Ala.App. 277, 55 So. 270; Kansas City, M. & B. R. Co. v. Butler, 143 Ala. 262, 38 So. 1024.

In the case at bar, defendants introduced evidence of statements made by insured to the effect that he had had a blackout. We are of opinion that, under the stated rule, plaintiff had a right to offer contradictory evidence and that the court did not err in overruling defendants' objections to the three questions.

Affirmed.

LIVINGSTON, C. J., and LAWSON and GOODWYN, JJ., concur.