Martha G. TATE, individually and as Executrix of the estate of Lake E. Tate, Deceased, Plaintiff–Appellant,

v.

GOVERNMENT EMPLOYEES INSURANCE COMPANY, Defendant–Appellee.

No. 92–6292.

United States Court of Appeals, Eleventh Circuit.

Aug. 17, 1993.

Ralph E. Coleman, Sr., Coleman & Friday, Birmingham, AL, for plaintiff-appellant.

Ollie L. Blan, Jr., Spain, Gillon, Grooms, Blan & Nettles, Pamela Felkins Colbert, Birmingham, AL, for defendant-appellee.

Before KRAVITCH and HATCHETT, Circuit Judges, and ATKINS *, Senior District Judge.

---

\* Honorable C. Clyde Atkins, Senior U.S. District Judge for the Southern District of Florida, sitting by designation.

1. Formerly considered a directed verdict, Federal Rule of Civil Procedure 50 now labels a direct-

HATCHETT, Circuit Judge:

Upon the death of Lake E. Tate (Tate), Martha G. Tate (appellant), the decedent's spouse, sued Government Employees Insurance Company (GEICO), the issuer of a group accidental death insurance policy (policy), to recover benefits under the policy for Tate's accidental death. Appellant appeals the district court's granting of GEICO's motion for a directed verdict.[1] Because we find genuine issues of fact and misapplication of state law, we vacate the judgment and remand the case to the district court.

## FACTS

On October 19, 1988, Tate entered the Veterans Administration Hospital in Birmingham, Alabama, for treatment of ear blockage and protruding ears. The treatment involved minor elective surgical procedures: bilateral myringotomy (for the ear blockage) and bilateral otoplasty (for protruding ears). A myringotomy involves making an incision in the eardrum and placing tubes to relieve pressure and to assist in hearing. Otoplasty is a correction of the deformity of the external ear which involves cutting and shaping the ears.

On October 19, 1988, prior to surgery, doctors at the hospital met with Tate, examined him, and performed diagnostic tests including a chest X-ray, routine blood screening, and an EKG. The doctors also advised Tate of the risks involved in the surgical procedures, including the risk of undergoing general anesthesia. Tate informed the doctors of his history of prostate cancer, but indicated to them that he did not have any problems. Based on the examinations and discussions with Tate prior to surgery, the doctors concluded that Tate was in good health and a proper candidate for surgery.

On October 20, 1988, Dr. Thomas Lee Eby performed the surgery. The surgery seemed a success with no complications, and Tate arrived at the recovery room appearing

---

ed verdict a "Judgment as a Matter of Law." The only difference is the name. *See* Fed. R.Civ.P. 50, Notes of Advisory Comm. on Rules 1991 amend. (1993).

in satisfactory condition. Although a doctor reported that Tate was fine, alert, and responsive, he died later the same day after falling while walking in the hall outside his hospital room. The death certificate indicated the cause of death as pulmonary embolus due to prostatic carcinoma.

In 1985, GEICO issued the policy at issue to Tate in return for the payment of premiums. The policy provides benefits for injuries "caused by an accident," and sets forth a number of exclusions, including an exclusion for death resulting from "illness."

## PROCEDURAL HISTORY

On March 30, 1989, appellant filed a request for benefits under the accidental death provisions of the policy, listing as the cause of death an "accidental blood clot to the lungs." In its letter dated July 31, 1989, GEICO denied benefits stating that the death was not accidental and the "illness" exclusion in the policy precluded benefits.

On January 17, 1990, appellant filed this lawsuit in the Jefferson County, Alabama Circuit Court seeking benefits under the policy and punitive damages for GEICO's bad faith in refusing to pay benefits under the policy. GEICO removed the case to the United States District Court for the Northern District of Alabama, Southern Division, and on July 10, 1991, filed a motion to dismiss the action. On July 17, 1991, the district court denied GEICO's motion to dismiss.

On March 9, 1992, the district court granted partial summary judgment for GEICO on appellant's bad faith claim and denied GEICO's motion for summary judgment on appellant's claim for breach of the insurance policy.

On March 10, 1992, the case proceeded to trial. Immediately following appellant's presentation of her case, GEICO rested without presenting any evidence and moved the court for a directed verdict. On March 11, 1992, the district court granted GEICO's motion, treating it as a motion for judgment as a matter of law pursuant to Federal Rule of Civil Procedure 50.

The district court, in its order, concluded that, as a matter of law, appellant failed to establish a case. The district court expressed its concern that Alabama courts had not dealt with a factual situation such as this case presented, but concluded that the Alabama courts would apply the following rule to this situation: "if an operation is not necessitated by an injury resulting from an accident, death occurring during or following the operation can be considered 'accidental' only when it is the result of mishap or misadventure in operative procedure." (Citing Couch on Insurance, 2d (Rev. ed.) § 41:113 (1982)). The district court found similarity with the policy's definition of "injury" in this case and in *Tate v. Insurance Company of North America*, Case No. CV–90–P–0085, where the court granted summary judgment in favor of the insurer and against appellant, albeit involving a different insurance company and policy.

On March 18, 1992, the district court denied appellant's motion for a new trial.

## CONTENTIONS

The appellant contends that the district court erred in granting GEICO's motion for judgment as a matter of law, for she presented sufficient evidence for a jury to find that an accident caused Tate's death. GEICO contends that the district court properly granted judgment as a matter of law in its favor, because appellant failed to rebut the death certificate's cause of death as prostatic cancer, and no evidence exists for a finding that an accident caused Tate's death.

## ISSUE

The issue in this case is whether the district court erred in granting judgment as a matter of law.

## DISCUSSION

### 1. STANDARD OF REVIEW

■ The standard of review employed in reviewing the district court's grant of a motion for judgment as a matter of law is the same as that the district court used to determine whether to grant the motion. "This

determination is made by evaluating all of the evidence, together with logical inferences, in the light most favorable to the party opposing the motion." *Adams v. Bainbridge–Decatur County Hosp. Authority*, 888 F.2d 1356, 1363 (11th Cir.1989). A judgment as a matter of law "will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986) (standard for summary judgment mirrors that of directed verdict).

## 2. THE POLICY

■ The policy at issue provides as follows:

> If injury is the result of any other cause, [not the result of riding as a fair paying passenger or riding as a passenger in or operating a motor vehicle or being struck by any such vehicle while a pedestrian] we will pay Benefits for the appropriate loss in accordance with the Table of Benefits below.

It is undisputed that the table of benefits show benefits in the amount of $20,000 for injuries resulting in death. The policy defines "injury" as follows:

> 'Injury' means bodily injury which is caused by an accident. The accident must take place while coverage of the Covered Person is in force. The accident must cause a loss covered by the Policy.

It is undisputed that the policy was in force at the time Tate died. Thus, the controlling determination is whether Tate's death (the injury) was "caused by an accident." Although the policy does not define the term "accident," the Supreme Court of Alabama defines "accident" for insurance policy purposes. Under Alabama law, the "term 'accident' has been variously defined as something unforeseen, unexpected, or unusual." *United States Fidelity & Guar. Co. v. Bonitz Insulation Co. of Alabama*, 424 So.2d 569, 572 (Ala.1982). The GEICO policy in this case is an "accidental means" policy in that

benefits are payable if injury "is caused by an accident." [2] In *Hairston v. Liberty Nat'l Life Ins. Co.*, 584 So.2d 807 (Ala.1991), the Supreme Court of Alabama explicated its broad definition of what constitutes a death or injury by accidental means:

> It is an accidental death or injury if the result is an accident whether or not due to accidental means; but it is caused by accidental means, although the means employed were voluntarily rendered, if, in the act preceding the injury, something unforeseen, unusual and unexpected occurs which produces the result.

*Hairston*, 584 So.2d at 808 (quoting *Emergency Aid Ins. Co. v. Dobbs*, 263 Ala. 594, 83 So.2d 335, 338 (1955)). GEICO asserts that the Alabama courts adequately define "accident," and in this case, GEICO stresses the limiting term "unforeseen" contained in the court's definition. "Provisions of insurance policies must be construed in light of the interpretation that ordinary men would place on the language used therein." *Newman v. St. Paul Fire and Marine Ins. Co.*, 456 So.2d 40, 41 (Ala.1984). Webster's Third New International Dictionary 2496 (1976) defines "unforeseen" as "not foreseen: unexpected." It defines the term "foreseen" as:

> to see (as a future occurrence or development) as certain or unavoidable; look forward to with assurance.

Webster's Third New International Dictionary 890. Thus, the appellant had to show that something unusual or unexpected caused Tate's death, in order to fit within the policy's definition of "injury." Moreover, because the policy contains an exclusion for injuries resulting from illness, appellant had to show that Tate did not die as a result of his prostate cancer.

## 3. ANALYSIS

■ GEICO contends that no evidence exists from which a jury could reasonably infer that an accident caused Tate's death, but rather the evidence reveals that Tate died from a blood clot resulting from his prostate cancer—a prior illness. Tate's death certifi-

---

**2.** Apparently, the Alabama courts distinguish between "accidental means" policies and "acciden-

tal results" policies. *Hairston*, 584 So.2d at 808.

cate reflects that "death was caused by pulmonary embolus due to, or as a consequence of: prostatic carcinoma," and GEICO asserts that in accordance with Alabama law, a doctor's certificate as to cause of death, while considered *prima facie* true, is conclusive if unrebutted. *Liberty Nat'l Life Ins. Co. v. Reid*, 276 Ala. 25, 158 So.2d 667, 675 (1963). GEICO argues that the appellant did not rebut the death certificate's cause of death; therefore, the district court properly granted judgment as a matter of law. GEICO reasons that the appellant's expert witness, Dr. Eby, acknowledged that Tate's death resulted from a pulmonary embolus. Although Dr. Eby testified that the embolism causing Tate's death was not expected, GEICO claims the embolism was foreseen based on Tate's use of Tace and his age of sixty-five years.[3]

■ Although Alabama law presumes as true the cause of death stated in a death certificate, this is a rebuttable presumption. *Reid*, 158 So.2d at 675.

In *Hairston*, the insured consumed a large amount of alcohol with his friends. After drinking excessively, Hairston "staggered" off stating that he was on his way home. Two days later, a neighbor found Hairston's body in a yard near where his friends last saw him. *Hairston*, 584 So.2d at 807. The coroner determined Hairston died as a result of acute ethanol poisoning. The trial court entered summary judgment for the insurer, holding that, as a matter of law, Hairston's death was not "accidental" within the meaning of the insurance policy. *Hairston*, 584 So.2d at 807. The Supreme Court of Alabama reversed, finding a question of fact whether Hairston's death was accidental. *Hairston*, 584 So.2d at 809. The court reasoned that "for insurance contract purposes, an insured is not held to intend all probable

or foreseeable consequences of his actions, and we determined that recovery is precluded only where 'there is a reasonable basis for his belief that his conduct makes serious injury or death a virtual certainty.'" *Hairston*, 584 So.2d at 809 (quoting from *Hearn v. Southern Life & Health Ins. Co.*, 454 So.2d 932 (Ala.1984)). Although *Hairston* involves a voluntary act on the part of the insured not present in this case, the court's language with reference to "foreseeable" consequences speaks to the Alabama court's leaning towards giving the jury the question of causation in cases involving accidental death benefits.

Two cases closer to appellant's case are: *Fidelity Serv. Ins. Co. v. Jones*, 280 Ala. 195, 191 So.2d 20 (1966) and *John Hancock Mut. Life Ins. Co. v. McCreary*, 37 Ala.App. 493, 70 So.2d 817 (1954). In *Jones*, the issue was whether the insured died solely as a result of an accident as opposed to a disease or illness. *Jones*, 191 So.2d at 24. At issue were insurance benefits payable for death resulting from accidental means. *Jones*, 191 So.2d at 21. Jones died after his head struck the tub, the fall breaking his nose, causing him to drown in the bath water. The evidence supported two theories as to the cause of Jones's fall: (1) the bathroom floor, including the rug, was wet and slick, and Jones could have fallen, struck his head on the tub, become unconscious and drowned as a result; and (2) medical testimony established that Jones had a history of blackouts; therefore, a blackout could have precipitated his fall into the tub and subsequent drowning. *Jones*, 191 So.2d at 24. Despite the death certificate's explanation of death as a blackout, an alleged illness, the court affirmed the judgment for insured's father, finding sufficient evidence for the jury to infer a slip and fall. *Jones*, 191 So.2d at 24.

---

3. On cross-examination, Dr. Eby testified that a side effect of tace, according to the Physicians Desk Reference, was the possibility of blood clotting. The record does not reflect the degree of risk involved with the use of tace. Dr. Eby did not know about Tate's prescription for tace prior to surgery, but this information did not alter Dr. Eby's opinion that death was "unexpected."

Dr. Eby testified that he agreed with an article in the New England Journal of Medicine that "mortality due to pulmonary embolism in the first few weeks after major surgery depends strongly on the age of the patient and the type and duration of the surgery," and that a substantial proportion of post-operative deaths occur in middle aged and older persons. Dr. Eby, however, also testified that despite Tate's age, he did not consider Tate an increased risk for pulmonary embolism. Thus, GEICO's contention that the embolism was foreseen based on the tace and age of Tate finds no merit in the record.

In *McCreary*, the insured died as a result of a pulmonary embolus (blood clot), and the issue was whether an automobile accident or Parkinson's disease caused the pulmonary embolus. *McCreary*, 70 So.2d at 819. At issue was insurance benefits for death resulting solely from accidental means. *McCreary*, 70 So.2d at 817. McCreary was a lively sixty-three years of age and had Parkinson's disease when he and his wife were victims of an auto accident. The accident left McCreary bedridden and in great pain. *McCreary*, 70 So.2d at 818. The medical testimony was that a blood clot may result from trauma, such as an auto accident; that Parkinson's disease does not cause blood clots until the disease advances to the stage where the patient is immobile. *McCreary*, 70 So.2d at 819. A doctor testified that because McCreary was not bedridden prior to the accident, Parkinson's disease was not related to his death. Based on this evidence, the court concluded that the jury could reasonably infer that the auto accident caused the embolus which caused McCreary's death. *McCreary*, 70 So.2d at 820.

Based on Alabama case law, we believe the Supreme Court of Alabama would hold that this evidence presented a jury question.

### 4. THE EVIDENCE

#### a. Testimony of Dr. Eby

At trial, the parties read the deposition of Dr. Eby, the only medical expert who testified at trial.[4] Dr. Eby testified that on October 19, 1988, he met with Tate and discussed the proposed surgery, its procedure and its risks. He testified that when he and the resident doctors examined Tate, they be-

lieved the risks of Tate dying from his prostate cancer were very small. Dr. Eby maintained that belief at the time of the deposition. He testified that prior to surgery, Tate showed no signs or symptoms of a pulmonary embolus. The doctors knew Tate had undergone a similar and successful anesthesia procedure previously.

Dr. Eby testified that he did not participate in filling out the death certificate. According to the autopsy report, "although the surgery went quite smoothly, the patient developed acute massive pulmonary embolism and expired on the same day of operation." In Dr. Eby's opinion, the cause of Tate's death was a pulmonary embolus. Dr. Eby believed that this pulmonary embolus caused Tate to fall. The question, however, in this case is what caused the embolus, and the testimony from Dr. Eby supports a theory entitling appellant to present her case to a jury. On cross-examination, GEICO presented Dr. Eby with an article from *The Medical Clinic of North America* concerning stasis, which is a lack of flow through the venous (vein) structures. Dr. Eby acknowledged that in relation to surgery, stasis can cause a pulmonary embolism in a small percentage of cases and that only a small percentage of people who undergo surgery suffer from pulmonary embolus. Dr. Eby testified that Tate did not die from the general anesthesia. Dr. Eby, however, testified that the three hours under anesthesia may have contributed to the development of stasis, which may have contributed to the embolism causing Tate's death, and that under the circumstances it seems likely that this is what occurred.[5]

---

**4.** Dr. Eby attended Stanford University and four years of medical school at the University of Wisconsin. In 1987, he joined the faculty at the University of Alabama in Birmingham as an assistant professor and presently holds that position, teaching aspiring physicians and occasionally treating people under contract with the Health Services Foundation and the Veterans Administration. Dr. Eby is board certified and specializes in otolaryngology which is ear, nose, and throat surgery.

**5.** Dr. Eby testified that the two procedures, the bilateral myringotomy and bilateral otoplasty, can take as long as an hour to perform or as short as twenty minutes. Tate's surgery lasted

roughly three and one-half hours. Dr. Eby testified that surgery began at 7:45 a.m. and the myringotomy was complete at 8:30. Between 8:30 and 9:00, personnel re-prepped and draped Tate in a sterile fashion so as to complete the operation. The otoplasty began at 9:00, and the records reflect that this procedure ended at 10:58 a.m.

On cross-examination, GEICO questioned Dr. Eby if he agreed with statements contained in the *New England Journal of Medicine*. One particular statement was that during prolonged general anesthesia, and any period of limited mobility following surgery, thrombosis (blood clot) formations may develop and that a few may travel to

■ Based on Dr. Eby's testimony and opinion, a jury could find that Tate died as a result of prolonged exposure to general anesthesia, creating stasis which formed an embolus causing death. According to Dr. Eby and medical journals, stasis is an unusual and unexpected development during surgery; although stasis is a possible risk, it nevertheless is an "accident" of surgery under the Alabama courts' definition of "accident."

The appellant's evidence creates doubt as to whether the prostate cancer and treatment had anything to do with Tate's death. Dr. Eby was unaware of any relationship between prostate cancer and pulmonary embolus. And, even if the jury considers Tate's use of the drug Tace as a factor in his death, this does not rule out an accidental cause of death. To what degree the use of Tace had on Tate's death is unknown. And under Alabama law, "when an insurer denies coverage based on an exclusionary clause it bears the burden of proving the applicability of that exclusion." *Jordan v. National Acc. Ins. Underwriters Inc.,* 922 F.2d 732, 735 (11th Cir.1991). Dr. Eby was the only medical expert to testify and his opinion was that Tate's death was unexpected, even considering the use of Tace, and that under the circumstances, it seemed likely that stasis formed as a result of prolonged surgery, causing an embolus. Thus, the jury could reasonably infer that Tate did not die as a result of the prostate cancer, but died as a result of prolonged surgery during which stasis developed causing an embolus.

A review of the Alabama cases and decisions of this Court shows that considerable latitude must be allowed the jury in determining the question of causation. An insurer cannot escape liability simply by showing that some disease may have contributed to some extent to the insured's death.

*Union Central Life Ins. Co. v. Scott,* 286 Ala. 10, 236 So.2d 328 (1970).

### b. Testimony of Family

The Alabama courts give weight to the testimony and expectations of the insured and family members. In *Scott,* the widow's testimony that her husband "had never been sick," "appeared to feel fine," and worked daily without any complaint of physical disability adequately contradicted the death certificate's cause of death as encephalomalacia, a disease. *Scott,* 236 So.2d at 335. And in *Hearn v. Southern Life & Health Ins. Co.,* 454 So.2d 932 (Ala.1984), the court defined "accident" using Black's Law Dictionary, 5th ed. (1979) as an "event which under the circumstances is unusual and unexpected by the person to whom it happens." *Hearn,* 454 So.2d at 934-35. Thus, Tate's family members' testimony is persuasive evidence to reverse.

Tate's son, John Tate, testified that his father was sixty-five years of age and worked at Redstone Arsenal in Huntsville, Alabama just prior to his death. John Tate testified that doctors diagnosed his father with prostatic cancer in 1980, but the cancer was under control. He further testified that his father suffered no effects from the cancer at the time of his death and had not experienced flare-ups or problems in the last year and a half to two years before his death. On October 19, 1988, the day before his death, Tate drove himself from Huntsville to Birmingham after a full day of work. He came to John Tate's office in Birmingham before checking into the hospital. He was very lighthearted and felt well. John Tate also testified that no member of his family was at the hospital during the surgery because of the minor nature of the procedures. John Tate visited his father immediately after surgery and at approximately 6:30 p.m. the same day, and testified that his father appeared to be fine.

Appellant also testified at trial. She testified that in 1980 a biopsy revealed that Tate's

---

the lungs and produce slight, substantial, or fatal effects. Dr. Eby agreed that the formation discussed was a pulmonary embolus. Dr. Eby testified that the length of surgery also is a factor increasing the risk of complications during general anesthesia.

Dr. Eby's testimony that the procedures can take as long as an hour, but that Tate's surgery lasted about three and one-half hours, together with the evidence of increased risk for prolonged surgery, further supports appellant's theory that death resulted from something unexpected or unusual.

prostate cancer was malignant, but with surgery and radiation he was doing well. Thereafter, Dr. Burns, a specialist in Birmingham, examined Tate and determined that he did not need any further surgery and could live a normal life, even twenty years, with the cancer. Later, in 1987, when the cancer flared-up, Tate visited Dr. Burns who said to go home and "forget it." Appellant testified that just three weeks prior to her husband's death, a doctor prescribed Tace for Tate's hot flashes associated with the 1980 cancer surgery. Other than the hot flashes, according to appellant, her husband's health was fine. Appellant explained that she did not travel to Birmingham with Tate because the surgery was minor and Tate had undergone this type of surgery before. Appellant testified that her husband was quite active in everything he did, including farming, motorcycling, and working. He was never sick.

From this testimony alone, a jury could reasonably infer that Tate did not expect the embolism to occur causing his death, nor did his family members foresee such an occurrence. Further, the jury could find that the prostate cancer did not cause Tate's death.

## CONCLUSION

The testimony at trial, considered in the light most favorable to appellant, is sufficient to preclude judgment as a matter of law. A question of fact exists whether the cause of Tate's death was an accident—something unexpected and unusual. Thus, we vacate the judgment of the district court and remand for a trial on the merits.

REVERSED and REMANDED.